**Carol A. CUSTER, Appellee**

v.

**Donald W. COCHRAN, Appellant.**

Superior Court of Pennsylvania.

Argued March 21, 2007.

Filed Sept. 25, 2007.

Kenneth S. Kornacki, Pittsburgh, for appellant.

Carolann A. Young, Somerset, for appellee.

BEFORE: FORD ELLIOTT, P.J., ORIE MELVIN, LALLY–GREEN, TODD, KLEIN, BENDER, BOWES, GANTMAN and PANELLA, JJ.

OPINION BY TODD, J.:

¶ 1 Donald W. Cochran ("Cochran") appeals the order entered against him pursuant to a petition brought under the Protection From Abuse Act (the "PFA Act" or the "Act"), 23 Pa.C.S.A. §§ 6101 *et seq.*, by his sister, Carol A. Custer ("Custer"). We affirm.

¶ 2 The factual background of this case is as follows. Cochran and Custer are siblings. Both are employed by a family

business, Cochran Farm Equipment, Inc., in which each has a 25% ownership interest. The remaining shares of the corporation are held by two other siblings who also each possess a 25% ownership interest. Custer and Cochran have their own families, do not live in close proximity to one another, do not socialize, and normally have no contact with one another outside of their workplace.

¶3 They have worked together in the family business for over 35 years. Custer is the office manager and serves as secretary-treasurer for the corporation. Cochran is the president of the corporation and Robert Cochran, the third sibling, is the vice-president. The fourth sibling, Darlene Beener, holds no office. Disputes have arisen among the family members concerning the manner in which Cochran runs the business. In this regard, Custer and Robert Cochran initiated civil litigation against Cochran seeking a buyout of their ownership interest or a dissolution of the corporation. Custer testified at the hearing in this case that, *inter alia*, the civil suit alleges that Cochran's verbal and physical threats constitute corporate oppression. (N.T. Hearing, 4/7/05, at 16.)

¶4 On November 12, 2004, Custer filed a PFA petition against Cochran based on a verbal and physical altercation between the parties on November 9, 2004. Based on testimony received from the parties at the PFA hearing on April 7, 2005, the trial court made the following factual findings:

On the morning of November 9, 2004, the parties traveled from their homes to the business premises, as usual. [Custer] had put her lunch in the refrigerator when [Cochran] arrived and began questioning [Custer]. [Cochran] was complaining about [Custer's] scheduling of a special shareholders' meeting. [Cochran] referred to [Custer] and her lawyer in derogatory terms and complained about scheduling of the board meeting. [Cochran] began yelling at [Custer], complaining that the board meeting was unnecessary and a waste of time and money. [Custer] told [Cochran] that she was going to her office and that she did not want to discuss the subject. [Custer] then walked to her office. [Cochran] followed [Custer], and continued to yell at her as she walked down the hall.

[Custer] went into her office and closed the door. She turned the volume of the radio up in an attempt to avoid listening to [Cochran's] ranting, and again told [him] she did not want to discuss the subject and not to come into her office. Despite the volume of the radio, [she] could still hear [him] yelling and screaming. [Cochran] was swearing at [Custer].

[Custer] yelled back at [Cochran] that she did not want him in her office and did not want to discuss the subject.

[Cochran] started opening the door to [Custer's] office. [Custer] stood up against the door to block the door from opening. [Cochran] continued to attempt to push the door open and to force himself into [Custer's] office, knocking [Custer] backwards, causing her to hit her leg and knocking a stool over. In the process, [Cochran's] eyeglasses came off. [Cochran] began screaming about his eyeglasses. [Custer] picked the glasses up, at which time [Cochran] hit [her] arm. The glasses flew out of [Custer's] hand. [Custer] believed that [Cochran] was trying to hurt her and that [Cochran] was in a rage.

(Trial Court Opinion, 5/27/05, at 4–5.)

¶5 The situation deteriorated further when Cochran told Custer to leave and, while swearing at her, began ransacking her office. Custer backed against a wall

and Cochran began to throw the contents of the office on the floor and then out the door. Cochran also took Custer's purse and threw it about 10 feet into the parts aisle, then emptied it onto the floor and kicked it. Cochran returned to Custer's office, and she informed him that she intended to call 911 unless he left. When she finally did call 911, Cochran returned to his own office to await the police. Custer did not press charges when the police arrived, and after they left, the parties completed their normal workday. Custer came to work the following two days, without incident, and then on November 12, 2004, she filed the PFA petition at issue.

¶ 6 The trial court entered a temporary emergency PFA order that same day.[1] Cochran filed a motion to dismiss the PFA petition for lack of jurisdiction, alleging that the dispute between the parties stemmed from a business disagreement and had nothing to do with their sibling relationship. Citing this Court's decision in *Olivieri v. Olivieri*, 451 Pa.Super. 50, 678 A.2d 393 (1996), wherein we held that the PFA Act was not "intended to resolve a dispute between [sibling] business partners who do not reside in the same household," *id.* at 53, 678 A.2d at 394, Cochran asserted that the allegations supporting Custer's petition were not within the ambit of the PFA Act. The trial court heard argument on Cochran's motion and determined that an evidentiary hearing was necessary to resolve the parties' claims.

¶ 7 Following the PFA hearing on April 7, 2005, the trial court entered a final PFA order, prohibiting Cochran from abusing, harassing, stalking, or threatening Custer and forbade him to enter her residence, for a period of six months.[2] Cochran filed this timely appeal, and a divided panel of this Court affirmed in a memorandum decision. Following the grant of Cochran's petition for reargument *en banc*, the panel decision was withdrawn, and now this appeal is ripe for our *en banc* consideration.

¶ 8 On appeal, Cochran asks:

I. Did the trial court err when it held that the Protection from Abuse Act applied to a business dispute between brother and sister who do not reside in [the] same household and have no contact with each other except for interaction at their common workplace when such holding was directly against the controlling decision of *Olivieri*, *[supra]*?

II. Was the trial court's finding that an act of "abuse" occurred as required under the Protection from Abuse Act supported by the evidence where [Custer] did not claim any substantial injury and there was no evidence that she feared that [Cochran] was going to cause her any physical or serious bodily harm?

(Appellant's Brief on Reargument at 2.)[3]

¶ 9 As an initial matter, we note that, in a PFA action, we review the trial

1. The temporary order prohibited Cochran from abusing, harassing, stalking, or threatening Custer, and precluded contact except to the extent required for the conduct of their business. (Temporary Protection From Abuse Order, 11/12/04.)

2. The PFA order expired on October 7, 2005.

3. Although the order on appeal expired in 2005, we will not dismiss this appeal as moot as it raises important public policy questions which may otherwise escape review, an exception to the mootness doctrine. *See Snyder v. Snyder*, 427 Pa.Super. 494, 500 n. 1, 629 A.2d 977, 980 n. 1 (1993) (noting that "Protection From Abuse Act Orders are usually temporary, and it is seldom that we have the opportunity to review one before it expires."); *Shandra v. Williams*, 819 A.2d 87, 90 (Pa.Super.2003) (same, quoting *Snyder*). Herein, we find the question of whether sibling busi-

court's legal conclusions for an error of law or an abuse of discretion. *Lawrence v. Bordner*, 907 A.2d 1109, 1112 (Pa.Super.2006). In *Commonwealth v. Widmer*, 560 Pa. 308, 322, 744 A.2d 745, 753 (2000), our Supreme Court defined "abuse of discretion" in the following way:

> The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Id.* at 322, 744 A.2d at 753 (quoting *Coker v. S.M. Flickinger Co., Inc.*, 533 Pa. 441, 447, 625 A.2d 1181, 1184–85 (1993)).

¶ 10 Cochran first argues that the trial court erred in issuing a PFA order because, he contends, the PFA Act does not cover siblings unless they reside in the same household. He relies principally on this Court's decision in *Olivieri, supra,* to argue that feuding sibling business partners who do not live together fall outside the Act. For the reasons that follow, we reject his argument.[4]

¶ 11 The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse. *Lawrence*, 907 A.2d at 1112. The Act defines "abuse" as follows:

> The occurrence of one or more of the following acts *between family or household members,* sexual or intimate partners or persons who share biological parenthood:
>
> (1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.
>
> (2) Placing another in reasonable fear of imminent serious bodily injury.

ness partners fall within the ambit of the PFA Act to be sufficiently important to warrant review. *See Snyder*, 427 Pa.Super. at 500 n. 1, 629 A.2d at 980 n. 1 (finding question of how narrowly a trial court must construe a PFA petition triggers public policy exception to mootness doctrine).

4. We briefly address Cochran's contention that this issue is one of jurisdiction. Cochran asserts that because, as he argues, the Act applies only to siblings who have a domestic relationship, the trial court was without jurisdiction to hear the petition. (*See* Appellant's Brief on Reargument at 8.) Undoubtedly, the trial court, sitting in the Family Division of the Court of Common Pleas, had subject matter jurisdiction to entertain petitions under the PFA Act. *See* 23 Pa.C.S.A. § 6103 ("The court shall have jurisdiction over all proceedings under [the PFA Act].") However, the *power* of the Court to act—that is, its ability to effect a certain result—is a different matter. *See Commonwealth v. Mockaitis*, 575 Pa. 5, 17, 834 A.2d 488, 495 (2003) (defining the distinction between a court's jurisdiction, which relates "solely to the competency of the particular court" to address the general class of controversies and a court's power to act which is "the ability of a decision-making body to order or effect a certain result" (internal quotation marks omitted)). Whether certain parties fall within the relationships covered by the PFA Act affects only the court's ability to grant relief, not its jurisdiction under the Act.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102 (emphasis added). The phrase "family or household members" is further defined as "[s]pouses or persons who have been spouses, persons living as spouses or who lived as spouses, parents and children, *other persons related by consanguinity* or affinity, current or former sexual or intimate partners or persons who share biological parenthood." *Id.* (emphasis added).

¶ 12 Cochran does not dispute, nor could he, that he and Custer, as siblings, are related by consanguinity.[5] He asserts, however, that the Act applies only to members of the same household, and that because Custer and Cochran have no domestic relationship, the Act does not cover them. While this claim was true under prior versions of the PFA Act, we find no support for the notion that a domestic

relationship is required under the Act's present language.

¶ 13 As originally enacted in 1976 and codified in Title 35 of Pennsylvania Statutes, the PFA Act limited relief to abuse between "family or household members who reside together." 35 P.S. § 10182 (1977) (amended 1978, repealed 1990). Indeed, the full title of the original Act was "An Act relating to abuse of adults and children by a person who resides with them; and providing for remedies and procedures." 35 P.S. § 10181 (1977) (amended 1978, repealed 1990), Historical Note. In 1978, the definition of abuse was expanded to "family or household members who reside together; or who formerly resided together and both parties continue to have legal access to the residence." 35 P.S. § 10182 (1988) (repealed 1990); *see generally Yankoskie v. Lenker*, 363 Pa.Super. 448, 453, 526 A.2d 429, 432 (1987) (discussing early evolution of the Act).

¶ 14 In 1990, the Legislature again expanded the reach of the Act and removed the restriction that the abuser must reside in the same household with his or her victim; these modifications, following amendments not relevant herein, resulted in the present definition of abuse quoted above. *See* 23 Pa.C.S.A. § 6102. Thus, Cochran's contention that the Act requires the parties to reside together finds no support in its present language, and is belied by the Act's history. Indeed, while we have stated that the Act's purpose is to protect victims of *domestic* violence, *see, e.g., Lawrence*, 907 A.2d at 1112; *Fonner v. Fonner*, 731 A.2d 160, 161 (Pa.Super.1999), the Legislature has nevertheless

5. The parties herein and the trial court presumed that siblings fell within the PFA Act's ambit as "persons who share biological parenthood." We find, however, that siblings unambiguously are "persons related by consanguinity," and thus fall under the Act on that basis. Accordingly, we do not address

the meaning of the phrase "persons who share biological parenthood" which arguably pertains to persons who are related by virtue of being the biological parents of a child—that is, sharing the status of being parents—and not persons who are siblings.

expanded the Act's definitions to encompass relationships outside the strictly domestic sphere.

¶ 15 We must also reject Cochran's reliance on this Court's decision in *Olivieri*, *supra*. There, as in the instant case, the parties were siblings who were also joint owners of a business and had initiated civil litigation over the manner in which the business was being run. In that context, both parties sought PFA orders against the other. The trial court ultimately determined that it could not grant relief:

> While it is true that Maria and Frank Olivieri are brother and sister, they are not family members that should be covered under the Protection From Abuse Act. The law is actually designed to protect those living under the same roof or who have access to the same residence from harming each other, and to preserve domestic tranquility. The legislature formulated the Protection From Abuse Act to focus upon the protection of families, not to settle business disputes. While Frank and Maria Olivieri are related by biological parenthood [6], in reality they are simply feuding business partners who are fighting about the way the business is run. The Olivieris have no connection with one another outside of the business. Through counsel, both parties admitted to the Court that they do not live in the same home, they do no socialize at all, and in fact cannot stand to be in the same room together.
>
> Thus, Frank and Maria Olivieri have abandoned in every sense the notion of brotherhood and sisterhood. They are

simply business partners who happen to have the same parents.

*Olivieri*, 451 Pa.Super. at 52, 678 A.2d at 394 (quoting trial court opinion). Specifically, the trial court made a factual finding that the Olivieris were seeking to use the PFA process as a mere procedural device to accelerate resolution of their civil dispute:

> Maria and Frank Olivieri attempted to utilize the equity function of the Philadelphia Family Courts to bring about an early solution to their dispute. By filing the abuse petitions as vehicles to bring the fight immediately before the court, Maria and Frank Olivieri hoped to have the business dispute settled as the underlying cause of the alleged abuse.

*Olivieri*, 451 Pa.Super. at 53, 678 A.2d at 394 (quoting trial court opinion). The trial court thus concluded that it lacked "jurisdiction to hear the pure law questions surrounding the jointly owned business." *Id.*

¶ 16 On appeal, this Court affirmed. Citing our decision in *Cipolla v. Cipolla*, 264 Pa.Super. 53, 398 A.2d 1053 (1979), for the proposition that the PFA Act is designed to protect against abuse between family members who reside together [7], we agreed with the trial court that "neither the Family Division nor the Protection From Abuse Act are intended to resolve a dispute between business partners who do not reside in the same household, whether or not the partners happen to share biological parents," emphasizing that the proper forum for resolution of their dispute was the civil courts. *Olivieri*, 451 Pa.Super. at 53, 678 A.2d at 394–95 ("[W]e will not

---

**6.** While in *Olivieri* the trial court and this Court indicated that siblings fell within the Act's definition of abuse as "persons who share biological parenthood," as we have noted, we find that siblings unambiguously fall under the Act as "persons related by consanguinity." *See supra* note 5.

**7.** As we discuss below, this holding is no longer valid under the present language of the PFA Act.

allow the Protection From Abuse Act to serve as a weapon in purely business disputes.").

¶ 17 *Olivieri* is in part distinguishable from the instant case. In *Olivieri* there was a factual finding by the trial court that the parties sought PFA relief as a mere ruse, as a back door to resolution of their business dispute, that they were in fact "simply feuding business partners." *Olivieri*, 451 Pa.Super. at 52, 678 A.2d at 394 (quoting trial court opinion).[8] By contrast, herein, while testimony indicates that Custer would like the civil suit against Cochran to be resolved as soon as possible, she did not request the trial court intervene in that case in any manner. Furthermore, as we discuss below, she presented evidence supporting her claim of abuse. Thus, unlike *Olivieri*, there is no suggestion or finding by the trial court that Custer sought PFA protection for any reason other than physical protection.

¶ 18 Moreover, to the degree that this Court in *Olivieri* limited application of the PFA Act to parties that reside in the same household, it was in error. Indeed, our citation in *Olivieri* to *Cipolla, supra,* wherein this Court indicated that the Act imposed a common residency requirement, was misguided. In *Cipolla,* we interpreted the original version of the Act, codified in 35 P.S. § 10182, which required common residency; however, the PFA petitions at issue in *Olivieri* fell under the current version of the Act, which omits any such restrictions. Thus, to the degree that *Olivieri* suggests that the present version of the PFA Act imposes a common residency requirement, it is expressly overruled.

¶ 19 We conclude that the trial court correctly determined that Custer's petition fell within the ambit of the Act. The plain language of the statute covers the relationship between Custer and Cochran. While Cochran argues that the purpose of the Act is to protect victims of *domestic* violence, a purpose this Court has reiterated, *see, e.g., Lawrence, supra; Fonner, supra,* and while there is no domestic component to the relationship between Custer and Cochran in the sense that they live together or even share a social life, the present language of the Act imposes no such domestic requirement. Regardless of what the perceived purpose of the Act may be, we may not disregard the plain language of the Act in pursuit of its purpose. *See* 1 Pa.C.S.A. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."); *id.* § 1921(c) (factors such as the statute's purpose may only be considered "[w]hen the words of the statute are not explicit"). As our Supreme Court has cautioned:

> Under Section 1921(c), it is only when the words of a statute "are not explicit" that a court may resort to other considerations, such as the statute's perceived "purpose," in order to ascertain legislative intent. *Id.* Consistently with the [Statutory Construction] Act, this Court has repeatedly recognized that rules of construction, such as consideration of a statute's perceived "object" or "purpose," are to be resorted to only when there is an ambiguity.

*In re Canvass of Absentee Ballots of November 4, 2003 General Election,* 577 Pa. 231, 243, 843 A.2d 1223, 1230 (2004). Herein, the Act unambiguously covers the

---

8. In the published opinion of the lower court, the court indicated that it additionally determined that the parties "were not interested in Final Protection Orders against one another, but in ensuring that the other would not gain the upper hand in the business," and that the parties had failed to prove their allegations of abuse. *Olivieri v. Olivieri,* 32 Phila. Co. Rptr. 460, 465 (Pa. Common Pleas 1995).

relationship between Custer and Cochran as siblings—they are related by consanguinity. As the statutory language is unambiguous, that ends our analysis.[910]

¶ 20 We reject Cochran's suggestion that, by so ruling, we put trial courts, or law enforcement, in the position of "emergency business arbiter, responsible for discerning in the first instance whether any particular business disagreement rises to the level of 'domestic abuse'." (Appellant's Brief on Reargument at 13.) The PFA statute is clear about the conduct that falls within its ambit, and both the courts and, when an order is issued, law enforcement, are quite capable of enforcing its terms.

 ¶ 21 Next, Appellant argues that the trial court erred in granting the PFA order because the evidence was insufficient to support a finding of abuse under the Act. When faced with a sufficiency challenge under the PFA Act, we review the evidence in the light most favorable to the petitioner and, granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. *Hood–O'Hara v. Wills,* 873 A.2d 757, 760 (Pa.Super.2005). Furthermore, we must defer to the credibility determinations of the trial court. *Id.* Finally, we note that a PFA petitioner is not required to file a police report, nor is it necessary for her to introduce medical evidence of an injury. *Id.* at

761. The petitioner's testimony is sufficient if it is believed by the trial court. *Id.*

¶ 22 The Act defines "abuse" as one of the five enumerated acts which we have quoted above. *See* 23 Pa.C.S.A. § 6102. Although in issuing the PFA order the trial court did not specify which of these acts it found, only two have possible application herein: "Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon," *id.* § 6102(1), or "Placing another in reasonable fear of imminent serious bodily injury," *id.* § 6102(2). Because we find that the evidence was sufficient to support the PFA order under the first category, we need not address the second.

¶ 23 In light of all the evidence adduced at the hearing, we conclude that there was sufficient evidence to support a finding that Cochran attempted to cause and intentionally, or at least recklessly, caused bodily injury to Custer. At the time of the hearing, Custer was 65 years old and Cochran was 59. Also, Custer is approximately 5 feet and 3½ inches tall, weighing about 125 pounds, while Cochran is approximately 6 feet tall, and weighs about 240 pounds, almost twice Custer's weight. Custer testified that on November 9, 2004, Cochran forced his way into her office,

9. By contrast, in *McCance v. McCance,* 908 A.2d 905, 908 (Pa.Super.2006), where the petitioner was married to the respondent's brother, we looked to the purposes and goals of the Act in order to determine that the relationship fell within the Act's use of the term "affinity" because that term was undefined.

10. Although, given our analysis, we do not rely on *its* finding, we note that the trial court additionally found that the altercation be-

tween Custer and Cochran was fueled by the sort of extreme emotions which generally are evoked only by a family relationship. (Trial Court Opinion, 5/27/05, at 10 ("[T]he abuse occurred at the workplace, [but] it is the family relationship which motivated the continuing harassment of [Custer] by [Cochran]."); *id.* at 12 (It was "the sibling rivalry which formed the basis for the complained of conduct.").)

knocking her backwards, causing her to hit her leg and knock over a stool. When she attempted to return the eyeglasses that came off his head during their scuffle, he hit her arm which, until approximately two weeks prior, had been splinted following surgery. After the incident, Custer experienced pain in the arm for several days, especially when lifting her arm, and she resumed wearing the splint.

¶ 24 Although Cochran disputed Custer's characterization of the seriousness of the altercation, (N.T. Trial, 4/7/05, at 112–116), the trial court specifically found Custer's description of the incident to be more accurate and credible than Cochran's version, (Trial Court Opinion, 5/27/05, at 7). In part, the trial court based this conclusion on the photographic exhibits presented during the hearing. (*Id.*) Despite Cochran's claims that the events at issue are standard tactics in a business dispute, we agree with the trial court that Cochran's behavior went far beyond that occurring even in a heated business dispute. As we find the evidence supports the trial court's factual determinations, we must accept them.

¶ 25 Furthermore, the incident on November 9, 2004, was not the first instance of violence between these parties.[11] Cochran slapped Custer on several different occasions. In October of 2002, Cochran slapped Custer and threw a book at her, to which she responded by slapping him back. On that occasion, Custer was forced to climb on top of a parts counter to escape from Cochran.

¶ 26 The trial court specifically found that Custer "is afraid of [Cochran] and fears the occurrence of further aggressive

and physical contact by [him]." (Trial Court Opinion, 5/27/05, at 7.) In light of the evidence presented at the hearing, we reject Cochran's argument that there was insufficient evidence to support the trial court's order.

¶ 27 For all the foregoing reasons, we affirm the order of the trial court.

¶ 28 Order **AFFIRMED.**

¶ 29 Judges LALLY–GREEN, BENDER, BOWES, GANTMAN, and PANELLA join in this majority decision, and Judges ORIE MELVIN and KLEIN concur in the result.

¶ 30 FORD ELLIOTT, P.J. files a Concurring Opinion which is joined by Judges ORIE MELVIN, KLEIN, BENDER, BOWES, and PANELLA.

## CONCURRING OPINION BY FORD ELLIOTT, P.J.:

¶ 1 I am constrained to agree with the Majority that under the definition of abuse set forth in the Protection From Abuse Act ("the Act"), the relationship between Custer and Cochran, that of biological sister and brother, provides standing to file a petition under the Act. I also agree that pursuant to statutory interpretation rules, when the words of a statute are clear, we may not ignore the letter and look to the perceived purpose of the statute. 1 Pa. C.S.A. § 1921(b). Therefore, I believe the Majority's analysis is statutorily sound. However, there is no question in my mind that the clear legislative purpose and objective of the Act is frustrated by applying its protections to a dispute between business partners concerning purely business matters.

11. It is proper for a trial court to admit evidence of prior abusive acts not raised in the PFA petition. *Raker v. Raker,* 847 A.2d 720, 726 (Pa.Super.2004). Because of the PFA Act's protective goals, some flexibility is allowed in the admission of evidence relating to past acts of abuse: "Past abusive conduct on the [defendant's] part [is] a crucial inquiry necessary for entry of a proper order." *Id.* (internal quotation marks omitted).

¶ 2 Repeatedly, this court has affirmed that the purpose of the Act, 23 Pa.C.S.A. § 6101 *et seq.*, is to "protect the victims of domestic violence from the perpetrators of such abuse." *Fonner v. Fonner*, 731 A.2d 160, 161 (Pa.Super.1999); *see also Snyder v. Snyder*, 427 Pa.Super. 494, 629 A.2d 977 (1993); *Weir v. Weir*, 428 Pa.Super. 515, 631 A.2d 650 (1993); *Burke ex rel. Burke v. Bauman*, 814 A.2d 206 (Pa.Super.2002). When the Act was originally passed in 1976, it was labeled "An Act relating to abuse of adults and children by a person who resides with them; and providing for remedies and procedures." 35 P.S. § 10181 (1977) (amended 1978, repealed 1990), historical note. Unquestionably, the Act was initially conceived to protect women and children from the scourge of domestic violence. According to its legislative history, throughout the various amendments and changes to the Act, the underlying purpose and goal, to protect victims of domestic violence, has never changed. The entire structure of the Act, the remedies provided, the training of police officials, the confidentiality provisions, the role of Domestic Violence Counselors, and the emergency relief provisions, speak to the purpose and goal of protecting victims of domestic violence, and providing a safe environment for them to continue their lives.

¶ 3 While the 1990 amendment removed the specific requirement that the parties reside within the same household, I disagree with the Majority's statement that by amendment, "the legislature has nevertheless expanded the Act's definitions to encompass relationships outside the strictly domestic sphere." (Majority opinion at 1055–56.) Rather, I believe that the amendment simply expanded the types of relationships which, given the circumstances, might clearly fit within the "domestic sphere." Where violence and abuse arise out of, and as a result of, a *domestic* relationship "between family or household members, sexual or intimate partners or persons who share biological parenthood," the Act applies whether or not the individuals reside together. By removing the "same household" language, I believe, the legislature simply enlarged the group of victims who have standing to seek relief under the Act so long as the abuse they suffer is the result of the intimate, sexual, or familial relationship they share or have shared with the abuser. Absent some connection to this domestic sphere, and the need to create a safe living environment for the victim, there are a myriad of other vehicles provided through both civil and criminal remedies which offer various forms of relief.[12]

¶ 4 Custer and Cochran are indeed brother and sister and thus their relationship is covered under the Act as "persons related by consanguinity." *See* 23 Pa. C.S.A. § 6102. However, their current relationship with each other does not exist in any domestic sphere, and as a strictly business relationship, it should not fall within the protections provided by the Act. Custer and Cochran have worked together as owners of the family business for many years. (Notes of testimony, 4/7/05 at 9–10.) In that time, their bond as brother and sister has ceased. (*Id.* at 14, 15, 109–111.) The parties have no contact with each other outside of the business, do not live in close proximity to each other, and do not socialize. (*Id.*) Custer admitted that Cochran has not visited her home in 15 years, and the only time they see each other is in the office. (*Id.* at 15.)

---

12. I recognize that for those entitled to relief under the PFA, the Act is not the exclusive remedy for victims of domestic violence. It may be sought in addition to any other civil or criminal remedy which is available to victims of abuse. *See* 23 Pa.C.S.A. § 6117.

¶ 5 Additionally, the incident which precipitated Custer's filing for a PFA order occurred at the workplace during business hours. The record reflects that the contentious relationship between the parties stems from a lawsuit which was filed by Custer to force the sale of the business. (*Id.* at 14.) There was no testimony that the alleged abuse occurred prior to the filing of the lawsuit, or that Custer has endured abuse by Cochran since childhood as the result of a family relationship. During the PFA hearing, Custer was asked her purpose in filing for a PFA order and what she hoped to accomplish. She replied,

> I would like to know what is going on in the business. [Cochran] does not tell the rest of us owners what is going on. [Cochran] runs the business, spends the money the way he wants to. We have no say at all. That's what the whole lawsuit is about.

*Id.* at 37. Thus, it is clear from the record that there is no support for the trial court's finding that the dispute between the parties stems from a familial relationship and ongoing domestic abuse between Custer and Cochran. (Trial court opinion, 5/27/05 at 10.)

¶ 6 Moreover, the PFA order granted by the trial court directed Cochran to have no contact with Custer except as it relates to the needs of their business. However, both parties admitted that prior to the entry of the order, they had no contact except as it pertained to the family business. Therefore, unlike a typical PFA order which would eliminate contact between the parties to ensure domestic safety and tranquility and to prevent further abuse, the order simply maintained the circumstances and the relationship which the parties were engaged in before the PFA order.

¶ 7 The instant facts are directly on point with *Olivieri v. Olivieri,* 451 Pa.Super. 50, 678 A.2d 393 (1996). While I realize that we are not bound by this court's decision in *Olivieri,* I believe the *Olivieri* panel's holding that the legislature formulated the Act to focus upon the protection of families, not to settle business disputes, is a proper interpretation of the intent of the legislation. Both cases involve parties who are involved in a strictly business relationship and have abandoned all notions of a familial relationship as brother and sister.

¶ 8 Certainly, I, along with the Majority opinion's author and all of the members of this *en banc* panel, fully appreciate and understand the importance of the Act in the lives of victims of domestic violence. It is only the application of the Act to the facts of this case which cause me great concern. As with *Olivieri,* I believe that to apply these crucial and important protections within the context of a strictly business relationship may very well be an abuse of the Act itself. However, based on the plain reading of the definitions provided by the Act, I accept that the Majority's affirmance of the trial court's grant of PFA relief is legally sustainable.