J-A20032-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| M.C.B., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| J.B. & D.B. | : | No. 1523 WDA 2015 |

Appeal from the Order September 22, 2015
in the Court of Common Pleas of Allegheny County,
Civil Division, No(s): FD 08-9184

BEFORE: BOWES, STABILE and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED SEPTEMBER 8, 2016**

M.C.B. ("Mother"), *pro se*, appeals from the Order entering a final

Protection From Abuse ("PFA") Order against her pursuant to the Protection

From Abuse Act ("PFAA"), 23 Pa.C.S.A. § 6101 *et seq.* We affirm.

The trial court set forth the relevant underlying history as follows:

Mother has a 12 year old daughter, [A.B. ("Child"),] of whom J[.B.] and D[.]B[.] (["]Paternal Grandparents["]) have been awarded primary legal and physical custody. By previous [O]rder of the court, Mother's contact with [Child] is supervised.[FN 1]

[FN 1] The parties have been involved in long and protracted custody litigation. At the time of the PFA hearing, the case was scheduled for a conciliation to review the results of a psychological evaluation for custody performed as a result of Mother's Petition for Modification of Custody. The existing custody [O]rder was the subject of prior litigation before the Superior Court, at which time [the trial court's] ruling permitting Mother to have unsupervised contact with [Child] was reversed. ***See B.B. vs. M.C.B. vs. J.B. and D.B.***, [31

A.3d 733] (Pa. Super. 2011).[1]   Since the PFA hearing, the custody case was scheduled for trial on December 10, 2015[,] and continued to February 10, 2016[,] at Mother's request.

At the final PFA hearing on [September 22], 2015 ["the PFA hearing"], the [court-appointed custody] supervisor[, C.H. ("the supervisor"), an Allegheny County juvenile probation officer,] credibly testified to the incident that led to [Paternal Grandparents'] filing of the [P]etition [for a PFA order, on July 22, 2015].  [On July 20, 2015,] Mother informed the supervisor via telephone that [Mother] wished to have her [scheduled] visit with [Child] at the Highland Park Pool.  [Mother] wished to swim in the pool with [Child], but the supervisor objected that she was not prepared to get into the pool along with Mother and [Child] to supervise their contact and communications.  Mother became agitated and hung up on the supervisor.  [Later that same day, Mother arrived at the agreed-upon meeting place at Highland Park, where she met Child and the supervisor after D.B. ("Paternal Grandmother") dropped them off in her car.]  … Mother told [Child] that the supervisor was not going to let [Child] swim.  The supervisor attempted to clarify that she was not prohibiting [Child] from swimming, but rather that she was not going to allow *Mother* to swim with [Child] without the requisite close supervision the supervisor was there to provide.

At that point, Mother grabbed [Child] by the shoulder and told the supervisor to get away from them.  The supervisor announced that she was ending the visit because of this altercation, and she attempted to lead [Child] away by the arm. Mother placed her arm around [Child's] neck, and declared that the visit was *not* ending, at which point both the supervisor and Mother called 911 for assistance.  Mother kept her arm around [Child's] neck during the 911 calls and[,] while waiting for officers to arrive, intermittently hurl[ed] abusive epithets at the supervisor[.  D]uring this time, [Child's] face became red, she attempted to get away from [] Mother, and she appeared to be "very upset and agitated about this."  [N.T., 9/22/15, at 11.]

---

[1] This Court concisely summarized the protracted custody litigation in its Memorandum, including the involvement of Child's Father, B.B., in the litigation.  ***See B.B.***, 31 A.3d 733 (unpublished Memorandum at 1-5).

Officers arriving on the scene observed Mother with her arm around [Child's] neck. They spoke with Mother, with the supervisor, and with [Child], who indicated that she wanted to go home. The officers let the parties go their separate ways[,] with [Child] in the care of [P]aternal [G]randmother, who had remained nearby during the whole episode. [Paternal Grandmother also testified at the PFA hearing, stating that] Mother's use of a "choke hold" on [Child] caused [Child] considerable fear and anxiety, leading her to tell [P]aternal [G]randmother tearfully that Mother "was choking me to death." [*Id.* at 25.] [Child] also had difficulty sleeping and performing at school for at least a week after this incident.

Trial Court Opinion, 12/2/15, at 1-3 (unnumbered) (emphasis and one footnote in original, footnote added). Mother also testified at the PFA hearing. Mother denied ever choking or strangling Child. N.T., 9/22/15, at 36-38. According to Mother, she was "just holding" Child, "in the shoulder," for approximately 20 minutes until the police responded to the 911 calls. N.T., 9/22/15, at 36, 38. Mother stated that her reaction was attributable to the supervisor's unreasonable decision to cancel the visit for no reason. *Id.* at 37.

At the close of the PFA hearing, the trial court entered a final PFA Order, prohibiting contact between Mother and Child for sixty days, subject

to a possible extension after a scheduled custody conciliation.[2]  In response, Mother timely filed a *pro se* Notice of Appeal.

We initially observe that Mother's handwritten, *pro se* brief fails to comply with the Rules of Appellate Procedure in numerous ways, including it lacking a statement of questions involved.  **See** Pa.R.A.P. 2111(a). Nevertheless, we decline to find waiver and will briefly address Mother's claims.

The sole cognizable claim that Mother presents on appeal[3] is that the trial court erred by issuing the PFA Order because the evidence presented at the PFA hearing was insufficient to support a finding of abuse under the PFAA.  Mother's Brief at 2.  Specifically, Mother alleges that the evidence belies the testimony of the supervisor and Paternal Grandmother that Mother strangled Child.  **Id.**

"In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion."  **Boykai v. Young**,

---

[2] The trial court did not extend the PFA Order beyond its expiration date. Additionally, we observe that Mother's appeal from the final PFA Order is not rendered moot by the expiration of the Order.  **See Shandra v. Williams**, 819 A.2d 87, 90 (Pa. Super. 2003) (stating that appeals from PFA orders "[raise] issues that fall into the well-recognized exception to the mootness doctrine of issues which have important public policy considerations and yet may escape review.  [PFAA] Orders are usually temporary, and it is seldom that we have the opportunity to review one before it expires." (internal citation and quotation marks omitted)); **see also Ferko-Fox v. Fox**, 68 A.3d 917, 920 (Pa. Super. 2013).

[3] The majority of Mother's assertions in her brief concern the child custody litigation, which is not relevant to the instant case.

83 A.3d 1043, 1046 (Pa. Super. 2014) (citation and quotation marks omitted). "When faced with a sufficiency challenge under the PFA[A], we review the evidence in the light most favorable to the petitioner and, granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence." *Custer v. Cochran*, 933 A.2d 1050, 1058 (Pa. Super. 2007) (*en banc*). Moreover, in making this assessment, this Court must defer to the credibility determinations of the trial court. *Id.*

"The [PFAA] was created to protect the victims of domestic violence from their abusers. Its goal is not punishment of abusers for past violent behavior, but advance prevention of physical and sexual abuse." *Burke ex rel. Burke v. Bauman*, 814 A.2d 206, 208 (Pa. Super. 2002) (internal citations omitted). Section 6102(a) of the PFAA defines "abuse" as:

> ([1]) intentionally, knowingly, or recklessly causing bodily injury; ([2]) placing another in reasonable fear of imminent [serious] bodily injury; ([3]) infliction of false imprisonment; ([4]) physically or sexually abusing minor children; or, ([5]) knowingly engaging in a course of conduct or repeatedly committing acts towards another person, including following the person, without proper authority, under circumstances which place the person in

reasonable fear of bodily injury.

*Id.* (citing 23 Pa.C.S.A. § 6102(a)).[4]  Actual physical harm is not a prerequisite for the entry of a PFA order; rather, the victim needs only to be in reasonable fear of imminent serious bodily injury.  *Fonner v. Fonner*, 731 A.2d 160, 163 (Pa. Super. 1999).

In the instant case, the trial court found that Mother's conduct in placing Child in a "choke hold" constituted abuse under subsection 6102(a)(2) (defining abuse as "placing another in reasonable fear of imminent serious bodily injury.").  Trial Court Opinion, 12/2/15, at 3 (unnumbered).  In support of this ruling, the trial court reasoned as follows:

> Mother contends that she had no intention of hurting [Child].  However, the fact remains that [Mother] had [Child] in a choke hold for an extended period of time.  The restraint Mother placed around [Child's] neck clearly constituted an impairment of [Child's] physical condition constituting "bodily injury" within the meaning of the [PFAA].  *See Commonwealth v. Ogin*, [540 A.2d 549, 552] ([Pa. Super.] 1988) ([stating that] "[t]he existence of substantial pain may be inferred from the circumstances surrounding the use of physical force even in the absence of a significant injury.")[; s]ee also[] *Karch v. Karch*, 885 A.2d 535[, 539] ([Pa. Super.] 2005) ([where] husband made shape of [a] gun with his fingers, "fired" it while touching wife's head with enough force to cause pain, and told wife that "there is your future[,]" [holding that this was evidence of abuse that was sufficient to sustain the grant of a PFA order]).  Further, under Section [6102(a)](2) of the definition of abuse, Mother's actions placed [Child] in reasonable fear of imminent

---

[4] The PFAA does not contain definitions of "serious bodily injury" or "bodily injury."  However, we observe that the Crimes Code defines serious bodily injury as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ[,]" and bodily injury as "impairment of physical condition or substantial pain."  18 Pa.C.S.A. § 2301.

serious bodily injury. Placing a twelve year old child in a choke hold certainly would – and did – cause that child to fear that she would be seriously hurt.

Trial Court Opinion, 12/2/15, at 3-4 (unnumbered). The trial court's rationale is supported by the record and the law, and we discern no error of law or abuse of discretion in its ruling. *See Boykai*, *supra*, at 1046.

Though Mother denies that she ever "choked" Child (instead asserting that Mother was merely holding Child by the shoulder), this Court must defer to the trial court's determinations regarding the credibility of witnesses at the PFA hearing. *See Custer*, *supra* at 1058; *Ferko-Fox*, 68 A.3d at 928. Here, the trial court discredited Mother's assertion in this regard, and credited the testimony of the supervisor and Paternal Grandmother.

Accordingly, we conclude that the trial court did not abuse its discretion in finding that the evidence warranted the issuance of a final PFA Order pursuant to section 6102(a), and Mother's challenge to the sufficiency of the evidence fails.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/8/2016