**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| A.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| L.S. | : | |
| | : | |
| Appellant | : | No. 717 MDA 2020 |

Appeal from the Order Entered April 28, 2020
In the Court of Common Pleas of York County Civil Division at No(s):
2020-FC-000655-12A

| | | |
|---|---|---|
| A.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.P. | : | |
| | : | |
| Appellant | : | No. 718 MDA 2020 |

Appeal from the Order Entered April 28, 2020
In the Court of Common Pleas of York County Civil Division at No(s):
2020-FC-000653-12A

| | | |
|---|---|---|
| A.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.C. | : | |
| | : | |
| Appellant | : | No. 719 MDA 2020 |

Appeal from the Order Entered April 28, 2020
In the Court of Common Pleas of York County Civil Division at No(s):
2020-FC-000654-12A

J-S54003-20, J-S54004-20 & J-S54005-20

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED MARCH 26, 2021**

Appellants L.S. (maternal grandmother), M.C. (maternal grandfather), and M.P. (paternal grandmother) (collectively, Appellants) appeal from the orders granting Appellee A.W.'s petition for a final protection order pursuant to the Protection From Abuse (PFA) Act, 23 Pa.C.S. §§ 6101-6122.[1] Appellants challenge the sufficiency of the evidence supporting the trial court's finding of abuse.  We affirm.

The trial court summarized the underlying facts of this matter as follows:

[Appellee] is the teenage young woman at the center of this case.  In March of 2018, [Appellee] was sexually abused by her grandfather, E.P., Jr., who is not a party to this action.  M.P. and E.P., Jr. are [Appellee]'s paternal grandparents.  E.P., Jr., the former or soon-to-be-former spouse of M.P., resided with M.P. at a house which [Appellee] would often visit during the time [Appellee] was abused, and which had a bedroom specifically for her.  E.P., Jr.'s sexual abuse of [Appellee] occurred in the bedroom set aside for [Appellee].  When M.P. learned of E.P., Jr.'s abuse of [Appellee], she terminated her relationship with him, and began work to dissolve the marriage.  A criminal investigation into the abuse was initiated, but [Appellee] was not able to continue with criminal charges at that time due to the trauma of the event.  [Appellee] testified that whenever she returns to the place of her abuse, she gets flashbacks and becomes sick.

Generally, [Appellee]'s life continued as normally as can be expected to under the circumstances after the time of her abuse.  However, [Appellee]'s mother, S.W., who is not a party to this

_____

[1] The appeals filed by L.S., M.P. and M.C. were docketed at 717 MDA 2020, 718 MDA 2020, and 719 MDA 2020, respectively.  Because all three matters involve related issues and parties, we consolidate them for appeal.  *See* Pa.R.A.P. 513.  We also note that because the parties' briefs are nearly identical, we refer to the issues raised in the Appellants' respective briefs as "Appellants' Brief."

- 2 -

appeal, was on lockdown in a halfway house, for reasons not at issue in this appeal. In February, while in the halfway house, S.W. remained in contact with her children, including [Appellee]. During this time, [Appellee] was placed in the physical custody of S.W.'s friend and [Appellee's] godmother, V.Y. In February of 2020, legal custody of [Appellee] was further transferred to V.Y. by a Minor Power of Attorney form. During one telephonic interaction between V.Y. and S.W., which [Appellee] overheard, S.W. admitted that she had sexually abused one of [Appellee]'s siblings, and either feared that she would, or planned to, do the same to [Appellee] if given the opportunity. Having already been the victim of sexual abuse, this caused [Appellee] to fear S.W.'s potential presence at any time in the near future, and V.Y. proceeded to advocate for [Appellee] safety by filing a Petition for Protection from Abuse against S.W.

At or around the same time, M.P., M.C., and L.S. had begun to, for some undetermined reason, disapprove of V.Y.'s custody of [Appellee]. While this [c]ourt held that the reasons were not relevant for the purposes of the [PFA] actions, some testimony by M.P. without objection indicated Appellants felt [Appellee] was unsafe in V.Y.'s residence because "there are three babies under the age of [three] in that home and that's just not the future that I see for her."

M.C. came into contact with his daughter, S.W., in order to discuss [Appellee]'s placement going forward. [Appellee] proffered a document which Appellants state S.W. signed on March 27, 2020, which revokes V.Y.'s guardianship of [Appellee]. This document was mailed to V.Y., and she received it on April 11, 2020. V.Y. testified she did not believe the document was actually signed by S.W. because S.W. and V.Y. were talking during this time and S.W. never told V.Y. directly that she wanted V.Y.'s custody of [Appellee] terminated. In part, V.Y.'s doubts were fostered by the fact that the letter was delivered to her by M.C., not S.W.

At first, Appellants voiced no objection to [Appellee]'s placement with V.Y. M.C. told V.Y. that V.Y.'s custody was the best place for [Appellee], and even provided V.Y. with some money, although it was testified that some of that money was intended for [Appellee]. L.S. visited [Appellee] while she was in V.Y.'s custody, and the two enjoyed the visit, which was particularly notable as they had been denied a relationship for some time on the basis of S.W.'s objections. M.P. also communicated with [Appellee], typically by phone on a bi-weekly basis. However, these positive

- 3 -

communications and socializations were temporary. When the placement of [Appellee]'s younger sibling with M.C. was complete, it placed Appellants' custodial focus on [Appellee]. The conversations then switched from what one might think of as a relationship between grandchild and grandparents, to one where there was a seemingly constant pressure campaign mounting to try to remove [Appellee] from V.Y.'s residence. [Appellee] testified that she was receiving both phone calls and texts from Appellants which made her "uncomfortable and terrified."

She further testified that specifically on a phone call she was "extremely upset," and told M.C. that she, "was not leaving [V.Y.'s] house," to which M.C. responded, "you can't say that." M.C.'s tone continued to be one of general dismissiveness towards [Appellee], as she testified that he said to her that, "he was going to give me the day to calm myself down and he would take me out of the house next," again amplifying the disregard to [Appellee]'s mental health complaints. [Appellee] was terrified at the possibility of leaving her residence with V.Y., in part because she feared that Appellants had plans to reunite her with S.W. in spite of S.W.'s threats to sexual[ly] abuse [Appellee]. At one point, L.S. even called the police to have [Appellee] removed from V.Y.'s residence. L.S. did not directly threaten to have [Appellee] removed, however.

M.C. had now gained custody of [Appellee]'s younger sibling and was working with M.P. and L.S. in order to gain physical and legal custody of [Appellee] so she could be placed with M.P. in the same home where [she] had been sexually abused. This is where Appellants shifted from their softer attempts to relocate [Appellee] with her cooperation, and began a course of conduct designed to remove [Appellee] involuntarily. Appellants filed for custody of [Appellee] in Adams County and made clear to [Appellee] that their intention for her was to place her with M.P. back in the exact same bedroom where her traumatizing abuse had occurred just two years before. This decision was not one that was being made unwittingly either. M.P., M.C., and L.S. all knew [Appellee] had been sexually abused in M.P.'s home and, despite this knowledge, intended that [Appellee] would be placed back into the room central to her trauma. M.C. even admitted he voiced concern for continuing with the custody action "Because I was concerned about going forward. About her ability to live with [M.P.] in the state of mind that she was in."

> Appellants were aware of the abuse she had suffered, and yet they did not soften their approach or reconsider their actions before the filing of these Protection from Abuse actions. [Appellee] began to experience such a great concern for her safety and mental health that she and V.Y. worked together to file these actions. V.Y. testified that [Appellee] was continuing to "break down even more and more," and that she was "becoming more scared."

Trial Ct. Op., 7/8/20, at 2-5 (unpaginated) (record citations omitted).

On April 28, 2020, following a bifurcated hearing, the trial court found that Appellee established abuse under 23 Pa.C.S. § 6102(a)(4). The trial court granted Appellee's petition and entered one-year PFA orders against Appellants.[2]

Appellants separately filed timely notices of appeal and identical Pa.R.A.P. 1925(b) statements.[3] The trial court issued a responsive Rule 1925(a) opinion addressing Appellants' claims. ***See*** Trial Ct. Op. at 6-11.

On appeal, Appellants raise the following issues:

---

[2] We note that the trial court issued no contact orders against L.S. and M.P., who both stated that they did not want any contact with Appellee. ***See*** Trial Ct. Op. at 10-11; ***see also*** N.T. PFA Hr'g, 4/28/20, at 169-70. The trial court entered a limited contact order against M.C., who indicated that he was open to having contact with Appellee. ***See*** Trial Ct. Op. at 10-11; ***see also*** N.T. PFA Hr'g at 169-70. The trial court also entered a three-year order against Appellee's mother, S.W., who did not participate in the PFA hearings or file an appeal.

[3] We note that Appellants raised additional issues in their Rule 1925(b) statement that they did not discuss in their brief. Therefore, those issues are abandoned for purposes of appeal. ***See Commonwealth v. Walker***, 836 A.2d 999, 1002 n.4 (Pa. Super. 2003).

1. Whether there was sufficient evidence admitted at trial to support a finding of abuse as that term is defined within the [PFA] Act and the Child Protective Services law?

2. Whether [Appellants'] pursuit of a custody action, involving the minor Appellee in this action, can constitute "mental abuse," as that term is defined within the Child Protective Services law, simply because that child is not a willing participant in the custody action filed by [Appellants]?

Appellants' Brief at 3 (full capitalization omitted).

Although Appellants listed two separate issues in their statement of questions, Appellants have combined those claims into one section in their brief. Therefore, we will address both issues together.

Appellants argue that there was insufficient evidence to support the trial court's finding of abuse under 23 Pa.C.S. § 6303(b.1)(3). Appellants' Brief at 11. Specifically, Appellants contend that Appellee failed to prove that Appellants acted with "the requisite intent to harm [Appellee]," as Appellants' "only intentional act was exercising [their] right to pursue custody." *Id.* at 11. Appellants contends that they are "not aware of any precedent which holds that pursuing a custody action constitutes abusive conduct against a child. To hold otherwise, the whole Custody Act would now be open to challenge as a result of such an extravagant interpretation of 'abuse.'" *Id.* Appellants also claim that Appellee failed to establish that she suffered from a "serious mental injury" due to Appellants' actions. *Id.* Appellants assert that there was no "competent medical evidence, other than a gratuitous claim of counseling," to establish "the existence of a psychological condition" under

Section 6303(a). *Id.* Therefore, Appellants argue that the trial court erred in granting Appellee's petition.[4]

Appellee responds that the PFA petitions were "never about the fact that [Appellants] filed for custody." Appellee's Brief at 10. Appellee explains that "with Appellants' awareness of the trauma [she] suffered in M.P.'s home in recent memory and the fact that Appellee clearly expressed her wishes not to go back, the Appellants' continued efforts to gain custody and place [Appellee] in M.P.'s residence is a clear and reckless disregard for [Appellee's] mental health." *Id.* at 11. She further contends that there was sufficient evidence to establish that she "suffered from serious mental injury due to the Appellants' incessant attempts to gain custody of [Appellee] and place back into M.P.'s residence." *Id.* Specifically, Appellee refers to testimony from V.Y., who stated that Appellee "continued to breakdown . . . and that she was becoming more scared with each passing day," as well as her own testimony that she "had flashbacks and felt sick every time she returned to M.P.'s home." *Id.* Appellee argues that "such testimony clearly illuminates that [Appellee] was suffering from significant mental abuse due to the continual efforts of Appellants to remove her from V.Y.'s care," even without evidence from a medical professional. *Id.* at 12.

_____

[4] In their argument section, Appellants contend that although the PFA orders were "only effective for six months," their claims should not be dismissed for mootness. Appellants' Brief at 7, 12-13. However, the record clearly reflects that the trial court entered one-year PFA orders against Appellants, which expire on April 28, 2021. Therefore, we need not address this issue on appeal.

"In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion." *Boykai v. Young*, 83 A.3d 1043, 1045 (Pa. Super. 2014) (citation and quotation marks omitted). "When faced with a sufficiency challenge under the PFA Act, we review the evidence in the light most favorable to the petitioner and, granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence." *Custer v. Cochran*, 933 A.2d 1050, 1058 (Pa. Super. 2007) (*en banc*). "[T]he preponderance of evidence standard is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." *Raker v. Raker*, 847 A.2d 720, 724 (Pa. Super. 2004). In making this assessment, this Court must defer to the credibility determinations of the trial court. *See Custer*, 933 A.2d at 1058.

"The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *Id.* at 1054 (citation omitted). Therefore, this Court has repeatedly held that a "PFA petitioner is not required to file a police report, nor is it necessary for her to introduce medical evidence of an injury. The petitioner's testimony is sufficient if it is believed by the trial court." *Id.* at 1058 (citation omitted).

The definition of "abuse" under the PFA Act includes physical and sexual abuse of minors, "including such terms as defined in Chapter 63 (relating to

child protective services)." 23 Pa.C.S. § 6102(a)(4)). The Child Protective Services Act sets forth the elements that an agency must prove in order to establish that a child's serious mental injury constitutes "child abuse" under the law. Specifically, Section 6303(b.1) defines "child abuse" as "intentionally, knowingly or recklessly . . . [c]ausing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act." 23 Pa.C.S. § 6303(b.1)(3).

Further, Section 6303(a) defines "serious mental injury" as

[a] psychological condition, as diagnosed by a physician or licensed psychologist, including the refusal of appropriate treatment, that:

(1) renders a child chronically and severely anxious, agitated, depressed, socially withdrawn, psychotic or in reasonable fear that the child's life or safety is threatened; or

(2) seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks.

23 Pa.C.S. § 6303(a).

This Court has explained that

The remedy for child abuse under the Child Protective Services Act is the removal of the child from the home and placement of the child in protective custody. 23 Pa.C.S. § 6315. Under the [PFA] Act, a parent, guardian, or adult household member may seek the legal remedies available under that Act, *i.e.*, a protective order prohibiting contact between an abuser and a victim or exclusion of the abuser from the victim's residence, for a victim of child abuse.

*Miller on Behalf of Walker v. Walker*, 665 A.2d 1252, 1258 (Pa. Super. 1995); *see also Viruet ex rel. Velasquez v. Cancel*, 727 A.2d 591, 595 (Pa. Super. 1999) (emphasizing this Court's "clear pronouncement that the PFA Act broadly defines abuse to allow a petitioner to obtain protection from abuse that may not rise to the level of abuse required for action under the Child Protective Services Law").

Here, the trial court addressed the sufficiency of the evidence establishing abuse as follows:

> It is this [c]ourt's holding that when an adult, or group of adults, conspires to place a child who has been traumatized by sexual abuse back into the environment where that very abuse took place, after that child has communicated that that action will place them into severe emotional peril, and where those adults know that the child continues to suffer from trauma as a result of the abuse, it meets this definition of abuse by substantially contributing to serious mental injury.
>
> M.P. testified she knew [Appellee] "needed counseling." M.P. also knew [Appellee] could not follow through on a criminal action "because [she] had too much anxiety." Even with this knowledge, M.P. worked toward having [Appellee] move into the same bedroom inside the same home where [Appellee] was sexually abused because, M.P. testified, [Appellee] is "a very strong girl and we'll get you through this." When [Appellee] told M.P. she did not want to move into M.P.'s house, M.P. did not inquire as to why, but instead joined a custody action seeking to force [Appellee] into her residence—the very residence in which [Appellee] was sexually abused only [two] years ago. Notably, this [c]ourt did not find M.P. undertook these actions intentionally. However, the definition of abuse does not require intentional acts. Instead, this [c]ourt found M.P. acted recklessly. Here, M.P. consciously disregarded the risk of serious mental injury to [Appellee] by attempting to force her into the environment in which she was abused.

M.C. testified that at one point he thought the custody action should be withdrawn because he had concerns about [Appellee]'s mental health in forcing her to life with M.P. in the same bedroom in which the abuse had taken place. Despite his own concerns, he moved forward with joining the custody action. M.C. knew it was Appellants' intention have [Appellee] live with M.P. As with M.P., M.C. has consciously disregarded his own admitted concern for [Appellee]'s mental health and sought to make her move into the home where she was sexually abused.

L.S. testified she was aware of the sexual abuse perpetrated against [Appellee]. L.S. also testified she knew the purpose of the custody complaint was to have [Appellee] stay "mainly with M.P." On April 9, 2020, 4 days before the custody complaint was filed, [Appellee] told L.S. through a text message "If you want back in my life and for me to ever speak to you, you'll stop this from happening." L.S. understood "this" to be the custody action of which M.C. had already told [Appellee]. Each of the three Appellants here knew [Appellee] had been sexually abused in M.P.'s home, knew [Appellee] did not want to return to M.P.'s, was still suffering trauma from effects of the abuse, and still sought to force [Appellee] through a custody action, back into M.P.'s home.

As the [c]ourt opined while announcing its decision at the conclusion of the hearing, "In light of the context of [Appellee]'s trauma and in light of the context of what recently occurred with her stepbrother and with the training this [c]ourt has, I interpret [Appellee's] statement that she will not leave her current house as if you make me leave this house and go live there, I may commit suicide." Whether or not [Appellee] would have contemplated or committed suicide or she simply would have suffered from flashbacks and getting sick as she had in the past, the [PFA] Act clearly provides that this [c]ourt can enter a final order to protect a child from serious mental injury.

Trial Ct. Op. at 7-9 (record citations omitted and some formatting altered).

Based on our review of the record, we discern no error of law or abuse of discretion by the trial court. *See Boykai*, 83 A.3d at 1045. The trial court specifically credited testimony that Appellee was suffering from mental breakdowns and experiencing fear and anxiety, possibly to the point where

she was contemplating suicide. **See** Trial Ct. Op. at 9. There being no dispute that Appellee was a victim of sexual abuse and the absurdity of Appellants' efforts to place her back in the bedroom where the abuse occurred, we find no error in the trial court's finding that Appellee suffered from abuse. **See Custer**, 933 A.2d at 1054. Therefore, under the circumstances of this case, Appellants are not entitled to relief.[5]

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/26/2021

---

[5] In any event, the trial court found that Appellee feared that Appellants would "reunite her with S.W. in spite of S.W.'s threats to sexual[ly] abuse [Appellee]." Trial Ct. Op. at 11; **see Custer**, 933 A.2d at 1054 (stating that the primary goal of the PFA Act is "advance prevention of physical and sexual abuse"); **see also** 23 Pa.C.S. § 6303(b.1)(6) (stating that "child abuse" includes "creating a likelihood of sexual abuse or exploitation of a child through any recent act or failure to act").