J-A02031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| C.L.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| E.L.W. | : | |
| | : | |
| Appellant | : | No. 553 MDA 2018 |

Appeal from the Order Entered March 8, 2018
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2016-CV--01388

BEFORE:  LAZARUS, J., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED APRIL 18, 2019**

Appellant E.L.W. appeals from the order granting Appellee C.L.W.'s petition to extend a protection order pursuant to the Protection From Abuse (PFA) Act, 23 Pa.C.S. §§ 6101-6122.  Appellant argues that the trial court erred in granting the extension because (1) Appellee was seeking "a tactical tool" in marital and business disputes and the order deprived Appellant of his property rights in his business, (2) the order was based on insufficient evidence, and (3) Appellant was precluded from cross-examining Appellee about her financial motivations for seeking an extension of the PFA order.  We affirm.

We adopt the trial court's facts and procedural history.  ***See*** Trial Ct. Op., 6/7/18, at 1-11.  Appellant filed a Pa.R.A.P. 1925(b) statement raising fourteen errors complained of on appeal.  In its Pa.R.A.P. 1925(a) opinion, the trial court distilled Appellant's claims into five main issues.

On appeal, Appellant raises the following questions for our review:

1. Did the trial court err in issuing/extending the PFA order against Appellant where Appellee sought the same as a tactical tool in marital litigation to resolve business disputes between the parties and their employees, and granting the same such that it excluded Appellant from his business thereby subjecting him to property interest deprivations that are not expressly permitted, authorized or otherwise sanctioned by the Act?

2. Did the trial court err in finding sufficient evidence that Appellant's conduct and contact with Appellee constituted harassment, abuse or continuing abuse which put Appellee in reasonable fear of imminent serious bodily injury or was otherwise an appropriate basis for issuing/extending a PFA order under the Act?

3. Did the trial court err in its evidentiary ruling[,] which precluded Appellant from cross-examining Appellee as to whether she had paid profit distributions to Appellant since the onset of the PFA order to establish Appellee's profit motive for seeking the same to resolve an ongoing business dispute with Appellant?

Appellant's Brief at 8. Of the five issues addressed by the trial court, Appellant has abandoned his claim that the trial court improperly admitted written exhibits presented by Appellee at the hearing. *See Commonwealth v. Rodgers*, 605 A.2d 1228, 1239 (Pa. Super. 1992) (stating, "[w]e must deem an issue abandoned where it has been identified on appeal but not properly developed in the appellant's brief" (citation omitted)). Additionally, Appellant has combined his issues regarding Appellee's motives for seeking an extension of the PFA order and the deprivation of his property interest into a single question on appeal.

Following our review of the record, the parties' briefs, and the well-reasoned opinion of the trial court, we affirm on the basis of the trial court's analysis of Appellant's issues on appeal. *See* Trial Ct. Op. at 11-18. Specifically, we find that the trial court properly concluded that Appellee sought PFA relief based on a genuine fear of Appellant, and not as a "tactical tool in marital litigation" or as a means of settling a business dispute, and that Appellant was not unlawfully deprived of his property interest in the parties' daycare center. *See id.* at 16-18. We also agree with the trial court that based on "the gravity of the original threats giving rise to the original PFA order and [Appellant's] pattern of conduct since that time, the record was entirely sufficient in proving by a preponderance of the evidence that he poses a continued risk of harm to [Appellee], warranting extension of the PFA." *Id.* at 10-16. Finally, we agree with the trial court that Appellant's third claim lacks merit because the court "specifically ruled . . . that counsel **was permitted** to ask [Appellee] about her motivation [] for seeking a PFA extension," and that Appellee's answers indicated that she was genuinely fearful of Appellant. *Id.* at 16-17.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/18/2019



Plaintiff

v.

Defendant

: IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA
:
: No. 2016-CV-01388-AB
:
:
: PROTECTION FROM ABUSE – Appeal

**June 7, 2018**

## MEMORANDUM OPINION

Defendant ▓▓▓▓▓▓ appeals from an order I issued March 8, 2018, extending a Protection From Abuse (PFA) order that had been previously issued against him, which was due to expire March 15, 2018. The March 8, 2018 order extends protection to Plaintiff ▓▓▓▓▓▓ for an additional two years. This opinion is written in support of the order extending the PFA order, pursuant to Pa.R.A.P. 1925(a).

## Background

### 2016 PFA and ICC Litigation

Plaintiff and Defendant were married in 2005 and have one child, currently twelve years old. The parties separated in October 2015. In February 2016, Plaintiff filed a petition under the Protection From Abuse Act (PFAA) alleging abuse against her by Defendant. A temporary, ex parte order was entered on February 22, 2016 by the Hon. Scott Evans which included provisions prohibiting Defendant from making any contact with Plaintiff including at her place of business. Plaintiff has been at all relevant times employed at a day care center she and Defendant jointly own as a partnership ▓▓▓▓▓▓▓▓▓▓▓▓ A final hearing was scheduled for March 15, 2016. Prior to the hearing, Defendant was charged with indirect criminal contempt for allegedly violating the terms of the temporary order and a hearing on those charges were scheduled to be heard at the final PFA hearing.

Plaintiff testified at that hearing before visiting Senior Judge Douglas Herman that on February 13, 2016, she received a voicemail from Defendant in which Defendant stated "he was going to crush me. I told you, mother fucker, I'll crush you, and I'll put you in the dirt." (N.T. 3/15/16 at 30) She considered this a threat to kill her. (Id.) Plaintiff received another voicemail the next day in

1

which Defendant threatened to "gut me." (N.T. 3/15/16 at 31, 33-34) Plaintiff also considered this a threat against her life. (N.T. 3/15/16 at 34) Plaintiff presented into evidence the audio recordings and verbatim transcripts of the two voicemails. (N.T. 3/15/16 at 34; Plaintiff Exbts. 1-3) After the court recessed to give Defendant's attorney an opportunity to listen to the audiotapes, Defendant consented to the entry of a protective order for a duration of two years without any admission to the allegations. (N.T. 3/15/16 at 37) Under the terms of the order, entered March 15, 2016, Defendant was directed to not "abuse, stalk, harass, threaten or attempt to use physical force" against Plaintiff. Defendant was also prohibited from having any contact with Plaintiff either directly or indirectly including at Plaintiff's home and at the day care center except that he could have "peaceful contact" with her via text messaging and email concerning custody of their child. In addition, Defendant was permitted to have access to the day care center on Sundays only. The order was set to expire March 15, 2018.

Regarding the indirect criminal contempt allegations, Plaintiff testified that shortly after the temporary PFA order was issued, Defendant twice sent her emails from the day care center's email address via his iPhone. In addition, she observed him twice slowly driving by the day care center while she was working there and staring at her, which she considered an attempt to intimidate her. (N.T. 3/15/16 at 6-9) Judge Herman found Defendant had violated the temporary PFA order by making these contacts, with knowledge he was violating the order, and found Defendant guilty of indirect criminal contempt. (N.T. 23-26) Judge Herman directed Defendant to pay court costs and fees related to the ICC charge but imposed no further penalty. Id.

Less than one month later, Defendant was again charged with indirect criminal contempt and a hearing was held on May 3, 2016 before Judge Herman. Defendant had sent a text message to both Plaintiff and to their then ten-year-old daughter on April 10, 2016 telling the child to tell Plaintiff to put $2,500 in his account so he could pay his bills. (N.T. 5/3/16 at 3, 5) Defendant agreed to plead guilty to indirect criminal contempt. He was sentenced to six months' probation, directed to undergo a drug and alcohol evaluation, follow recommended treatment and wear a SCRAM bracelet to monitor his alcohol consumption. (N.T. 5/3/16 at 4-5)

## Related Litigation

I take judicial notice of other custody, divorce and civil litigation between the parties during the time period the original PFA order has been in effect, as it is directly relevant to the dynamics of the parties' relationship and Defendant's conduct towards Plaintiff over the last few years.

2

**Divorce Action:** Plaintiff initiated a divorce action against Defendant in February 2016, around the same time she sought relief under the PFAA.[1] The primary issue contested concerns equitable distribution of the parties' day care center, which employs Plaintiff and sixteen others and serves ninety children. On April 28, 2016, Plaintiff filed an emergency petition for special relief in response to an email from Defendant stating that he would be filing for bankruptcy and intended to close down the day care center. In her petition, Plaintiff sought to be granted exclusive day-to-day operational, managerial and financial authority to run the business.

Plaintiff asserted in her emergency petition that Defendant had caused problems for the day care center including complaints made November 12, 2015 to the Pennsylvania Department of Human Services (DHS) that Defendant was drunk and belligerent at the day care property and was abusive towards employees. This complaint prompted a surprise inspection by DHS. According to the petition, DHS initiated a second investigation after it received a ChildLine complaint January 12, 2016 alleging Defendant was promoting guns in daycares, was drunk and belligerent on site and appeared to be on drugs. Thereafter, DHS appeared weekly to ensure Defendant was not on the property. The petition further alleged that Defendant withdrew $14,000 in business operating funds in February and March 2016, leaving the business insufficient funds. After Plaintiff obtained the final PFA order in March 2016, Defendant changed the passwords to business accounts and the business' Facebook page and added himself as an employee on payroll. In April 2016, he instructed the USPS to hold all business mail and appeared intoxicated while on site. Finally, the petition alleged that one of the day care center employees filed sexual a harassment complaint against Defendant with the Human Relations Commission. ██████████ No. 2016 CV 1504 DV; Em. Petition for Sp. Relief (4/28/18))

After Defendant failed to respond to a rule to show cause why the relief requested should not be granted, I issued an order May 10, 2016 granting Plaintiff the relief sought. Defendant did not appeal from this order although he filed a motion for reconsideration almost four months later (September 2, 2016), in which he claimed he never received contemporaneous service of the underlying emergency petition and final order, mailed to his last known address. He nevertheless admitted he hired an attorney May 17, 2016 and became personally aware of emergency petition and rule to show cause no later than May 23, 2016. Due to the lateness of his filing, I denied the motion

---

[1] ██████████ No. 2016 CV 1504 DV (Dauphin County).

3

for reconsideration following an in chambers conference with counsel, September 23, 2016. I granted Defendant partial relief, agreed to by Plaintiff, that the day care center bookkeeper provide Defendant with all financial records related to the day care center. Since that time, the divorce matter has proceeded through discovery and numerous conferences with the divorce master including an unsuccessful final settlement conference in November 2017. That litigation concerns valuation and equitable distribution of all marital property including the day care center. Final hearings on equitable distribution are currently stayed, however, upon agreement of the parties pending resolution of a federal civil action filed by Defendant in December 2017 against Plaintiff and her attorney (discussed below).

**Custody Action:** Following the parties' October 2015 separation, Plaintiff maintained primary physical custody of their child. Defendant-father filed a custody action in May 2016 seeking physical custody.[2] In July 2016, following conciliation, the parties agreed to an interim custody order. Included in the agreed order, and based upon the recommendation of the conciliator, the order directed that Defendant undergo an Initial Evaluation pursuant to Custody Act Section 5329(c) (Consideration of Criminal Conviction).[3] A 51-page Evaluation was completed by Spirit & Associates and provided for my review prior to the parties' pre-trial custody conference September 23, 2016. The Evaluation concluded that Defendant chronically abuses alcohol and becomes angry and aggressive when drinking. The mental health professionals who authored the Evaluation issued a number of recommendations for Defendant's alcohol and domestic abuse.[4]

At the pre-trial custody conference with the parties and their attorneys, the parties agreed to an interim order / parenting plan providing the parties shared legal custody, Plaintiff primary physical

---

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ No. 2016 CV 3835 CU (Dauphin County).

[3] Custody Act Section 5329(c) permits the court or conference officer to require an initial evaluation to determine whether a party or household member, who has committed one of the enumerated offenses set forth in the statute, poses a threat to the child and whether counseling is necessary. After the initial evaluation, the court may order further evaluation or counseling by a mental health professional, if needed. 23 Pa.C.S.A. § 5329. In this case, Defendant had a 1993 DUI conviction as well as the two 2016 indirect criminal contempt convictions in this PFA action. These offenses are included amongst those enumerated in the statute which trigger the court's right to order an evaluation.

[4] The Spirit & Associates Evaluation (filed September 23, 2016) recommended that (1) Defendant immediately participate in a recovery community (such as AA) on a weekly basis for six months; (2) complete a course with a counselor/therapist who specializes in domestic abuse and treatment; (3) maintain complete abstinence from alcohol for one year; and (4) grant Plaintiff the right to request random drug tests at her cost, up to one time per month. (Evaluation pp. 50-51)

4

custody and Defendant limited physical custody for a few hours per day for three days every two weeks (no overnights). The matter was scheduled for a full custody trial to consider Defendant's request for equally shared physical custody. In January 2017, just prior to the trial, Plaintiff filed a motion for sanctions due to Defendant's failure to file his mandatory pre-trial statement under Pa.R.C.P. 1915.4-4(b) and failure to follow the Evaluation's Recommendations. She asserted that Defendant had recently obtained new employment in a liquor store located in the same shopping complex where the day care center was located. I granted the motion and as a sanction, directed that Defendant be precluded from presenting any witnesses at the custody hearing other than himself. Plaintiff, in her pre-trial statement, had listed numerous witnesses including experts concerning the Section 5329 Evaluation.

On the hearing date, January 18, 2017, Defendant abandoned his request for equally shared physical custody and the parties reached a verbal agreement allowing him physical custodial periods supervised by his parents, which his attorney would reduce to writing in a prepared order with attached supervisor affidavits signed by his parents. No such order was supplied to the court, however, because Defendant's parents were not amenable to act as supervisors. Another custody hearing was thus scheduled for July 21, 2017. The parties again reached an agreed custody order/parenting plan under which terms Plaintiff maintained primary physical custody and Defendant partial custody for periods as agreed to by the parties. The Order also directed that Defendant follow the Recommendations set forth in the Evaluation (see footnote 4), including enrolling in counseling within ten days.

**Civil Action (District Court / MDJ):** On May 19, 2016, just nine days after I granted Plaintiff exclusive control of the day care center in the divorce action, Defendant filed a civil complaint in Magisterial District Court demanding judgment of $12,000 against Plaintiff.[5] The handwritten complaint states "partnership suppression, related to 50/50 rights, fair & equal share of profits" and some other illegible claims. (Exbt. Plt-1) According to the docket, the matter was withdrawn by Defendant just five days later.

---

[5] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ No. MJ-12102-CV-0000037-2016 2017 (Mag. Dist. Ct.12-1-2).

Civil Action (Dauphin County CCP): On February 2, 2017, Defendant filed a writ of summons with a request for pre-complaint discovery in the Dauphin County Court of Common Pleas. The filing indicated the case was for breach of contract and sought an accounting.[6] Defendant filed interrogatories upon Plaintiff seeking the day care center's financial and related information in order to address his concerns he would receive his equitable share of post-separation profits. Plaintiff filed a motion for protective order arguing, among other things, that *all* information sought was available in the divorce action through normal discovery proceedings, noting that the day care center's valuation was a primary issue being litigated. Following an in chambers conference with counsel, I granted the protective order March 21, 2017 because all such issues are solely within the province of the equitable distribution proceedings in the parties' pending divorce action. Additional litigation on duplicative claims would only require the parties to expend additional attorney fees and reduce the marital value of the day care center. After Plaintiff filed a praecipe directing Defendant to file a complaint, Defendant voluntarily discontinued the action, in September 2017.

Civil Action (Middle District Pa.): On December 1, 2017, Defendant filed a 56-page civil complaint in federal court against Plaintiff, her attorney Nichole Staley O'Gorman and the Staley O'Gorman Family Law Practice.[7] In his complaint, Defendant raised numerous allegations against all three parties for civil rights violations, tort claims (aiding and abetting breach of fiduciary duty, fraudulent representation, tortious interference with business relations), contract breaches and claims for unjust enrichment and conversion. Defendant primarily asserts Plaintiff, her attorney and law firm conspired against him to deprive him of day care center profits. Defendant's assertions specifically take issue with the fact that Plaintiff, acting through her attorney, sought and obtained special relief in the divorce action, wherein I issued the May 10, 2016 order granting Plaintiff exclusive day-to-day operational, managerial and financial authority to run the day care center. He alleges that I issued the order without him having been provided notice and a fair opportunity to be heard which deprived him of his right to run the day care center. He also alleges that Plaintiff, her attorney and law firm conspired to obtain this the order in the divorce action so they could siphon off day care center profits. Defendant additionally suggests that the March 21, 2017 order I issued, prohibiting him from obtaining pre-complaint discovery in the Dauphin County civil action (which action he later discontinued), was in

[6] ███████████████████████████████████ 2017 CV 00784 CV (Dauphin County).

[7] ███████████████████████████████████Staley O'Gorman Family Law Practice, No. 1:17-CV-02201 (Middle District Pa.).

violation of his rights because the order was entered without Defendant having been given adequate notice and an opportunity to be heard.

All parties named as defendants in this federal action have since filed motions to dismiss which are currently pending, and have a high probability of being granted, inasmuch as the claims made by Defendant appear wholly frivolous and where all the substantive claims Defendant has raised concerning the day care center will be fully litigated before the divorce master in the Dauphin County divorce action or could have been otherwise pursued on appeal in the various state court actions.

### Motion for PFA Extension

On March 1, 2018, Plaintiff filed a motion seeking to extend the existing PFA order for an additional three years from its March 15, 2018 expiration date. I held a hearing on March 8, 2018. Plaintiff, who was self-represented,[8] testified that since the original PFA order was entered in February 2016, Defendant has gone to extensive lengths to continue to harass and threaten her, including going to "extraordinary lengths" to make her ability to run the day care center extremely difficult. (N.T. 3/8/18 at 2-3) She presented numerous exhibits in a packet of written materials including a two-page timeline summary of conduct by Defendant and related events occurring over the last two years. She included copies of numerous emails, text messages, court records, witness statements and other items which I admitted as Plaintiff's Exhibit 1. (N.T. 3/8/18 at 1-2, 13; Exbt. Plt-1) In addition, she testified to Defendant's post-PFA conduct and related events in support, which have caused her to be fearful of him and suffer great stress. (N.T. 3/8/18 at 10, 22)

She initially testified concerning Defendant's two 2016 convictions for indirect criminal contempt due to his violations of the PFA order as well as the conduct upon which the convictions were based, recited above. (N.T. 3/8/18 at 2-4) She additionally recounted that she had to obtain special relief in the divorce action to solely operate the business after Defendant initially threatened to shut it down and later acted to actively harm it. Defendant subsequently initiated the frivolous MDJ action against Plaintiff to recover "lost profits" from the day care just nine days after she obtained the right to solely run the day care center. (N.T. 3/8/18 at 4-5)

---

[8] Plaintiff had been represented in the original PFA hearing by Nichole Staley O'Gorman. Ms. O'Gorman had also represented Plaintiff throughout her divorce and custody proceedings until she withdrew from those actions in January 2018 due to her decision to stop practicing law.

7

Plaintiff testified that Defendant has a history of heavily drinking while working at the day care center and acting inappropriately while drunk, which she noted was reflected in affidavits submitted by numerous day care center employees. She recounted that she had been required to pay part of a financial settlement Defendant negotiated in 2016 with the EEOC due to his sexual harassment of a day care center employee, which negotiation and settlement were in violation of the court order prohibiting him from acting on the day care center's behalf. (N.T. 3/8/18 at 5)

Plaintiff further testified and provided documentation that on June 15, 2016, while Defendant was subject to the PFA order forbidding him from directly or indirectly having any contact with Plaintiff, Defendant made a post to his Facebook page where he stated:

Chicks be so bananas. I never want to date again.

You never deserved to have my child, meet my parents, or anything to do with the relationships of life. ...

Yup, Men have caught the fraud by degrees of faux manipulative empathy and an absolute lack of knowledge related to raising a child to be better than She and Her Mother were.

As Men – we are pissed.

Men are asking our children back.

The sure shot.

(N.T. 3/8/18 at 5; Exbt. Plt-1) While Defendant posted these remarks on his Facebook page without specifically tagging Plaintiff, she became aware of the posting when they appeared on the day care business's Facebook page timeline since Defendant was Facebook "friends" with their day care center through Facebook. (N.T. 3/8/18 at 55) Plaintiff considered this an indirect threat by him to take the child from her. (N.T. 3/8/18 at 55)

On August 22, 2016, Spirit & Associates sent an email to Plaintiff to inform her that it had finished the court-ordered Evaluation of Defendant in the custody action and that based upon their findings, it was ethically obligated to warn her that Defendant might exhibit an increase in aggression or abusive behavior directed at her in reaction to the Evaluation. (N.T. 3/8/18 at 5; Exbt. Plt-1)

Plaintiff testified and provided documentation that in November 2016, Defendant sent her a text that stated: "I have had a very long year away from [my child] and my family. I want to come home to the family that we created with [the child] as the anchor. I want to repair the damage that I've

8

done to [our child's] family." (N.T. 3/8/18 at 6; Exbt. Plt-1) Plaintiff considered this text emotionally abusive inasmuch as he was attempting to get back together with her and that it was also in violation of the PFA order because its content did not concern issues of child care. (N.T. 3/8/18 at 30)

Shortly after sending this text, Defendant got a job at the liquor store located in the same shopping plaza as the day care center. (N.T. 3/8/18 at 6) She testified that she considered his decision to work just "three doors down" from the day care center an effort to intimidate her. (N.T. 3/8/18 at 32-33) While working there, he would often stand at the very edge of the liquor store property and stare into the day care center's large bay windows. (N.T. 3/8/18 at 33-34)

In February 2017, Defendant initiated a second civil lawsuit against Plaintiff, this one filed with the Dauphin County Court of Common Pleas, by filing a writ of summons seeking $12,000 from Plaintiff. As noted, Defendant later discontinued this action after I issued a protective order. (N.T. 3/8/18 at 5) Plaintiff considered both this lawsuit and the May 2016 MDJ action that he also withdrew to be emotionally abusive to her inasmuch as he was causing her duress by threatening her livelihood and using civil process to harass her. (N.T. 3/8/18 at 29, 55)

Plaintiff testified and provided documentation that on June 18, 2017, Defendant sent a text message to one of Plaintiff's male friends with a picture of Plaintiff in the friend's car and wrote "Let's not forget who I am. Happy Father's Day." He then sent the same picture to Plaintiff with a comment questioning who Plaintiff is allowed to have in her home. (N.T. 3/8/18 at 6; Exbt. Plt-1) This latest series of contacts prompted Plaintiff to contact police who filed an indirect criminal contempt charge. At the ICC hearing before the Honorable William Tully, Plaintiff began to testify but became so emotional she walked out of the hearing and therefore the ICC charge was dropped. (N.T. 3/8/18 at 6-7, 19-20)

In late November 2017, Plaintiff received a text message from Defendant which appeared as if Defendant was writing it to his current attorney James Ellison. The text message discussed their impending federal lawsuit against Plaintiff and her attorney. Defendant wrote that the lawsuit would be more than Plaintiff and her attorney could imagine and that they would have to put in so much effort defending it that "[t]hey'll go broke just responding." Immediately after Defendant sent this message to Plaintiff, he sent another in which he claimed "I inadvertently sent this to you. My apologies." (N.T. 7; Exbt. Plt-1)

9

Plaintiff testified that one of her day care center employees, ███████████ told her that on Sunday February 25, 2018 she encountered Defendant while she was cleaning at the day care center. Defendant said to ██████as she was leaving, "See you in 20 days!" which was right around March 15, 2018, when the initial PFA order expired, which testimony ██████ later confirmed in her own testimony. (N.T. 3/8/18 at 8, 64)

Plaintiff concluded that based upon her experience with Defendant the last few years, she believes he continues to drink heavily and has not completed the recommendations of Spirit & Associates. (N.T. 3/8/18 at 8, 59-60)

During cross examination of Plaintiff, Defendant's attorney presented copies of selected text messages between Plaintiff and Defendant. (N.T. 3/8/18 at 12-13, 34-46; Exbt. Def-A) The texts concerned permitted contact between Plaintiff and Defendant regarding custody of their child. Plaintiff admitted that many of the messages were cordial and that Plaintiff encouraged Defendant's involvement in their child's life. (N.T. 3/8/18 at 35, 37) Other messages revealed Plaintiff would get angry and accusatory about Defendant, including times when she thought Defendant was messaging her concerning issues not directly related to the child but rather about him wanting to know what she was doing and where she was. (N.T. 3/8/18 at 36, 43-44) She testified that some of the frustration revealed in the messages was due to him attending their child's events while drunk and that when he was drunk his demeanor changed dramatically. (N.T. 3/8/18 at 38, 43, 45)

██████████ an employee at the day care center, testified on Plaintiff's behalf at the PFA extension hearing. She agreed that her testimony would be the same as what was included in her written statement/affidavit which Plaintiff included in the packet of written materials she presented at the hearing. (N.T. 3/8/18 at 64-68; Exbt. Plt-1) According to her statement, while employed at the center between 2014 and 2016, she observed Defendant leave the property during work hours almost every day to go to the liquor store, which was visible from day care center. (Id.) When he returned, he smelled of alcohol and would often become belligerent and angry, including swearing in front of the children. (Id.) ██████also stated that she was aware that parents complained about his drinking and that the Department of Welfare inspected the property as a result. On a number of occasions, she observed Defendant loudly arguing with Plaintiff who would often leave crying. (Id.) She recalled that on Sunday April 24, 2016, while Defendant was visiting the property, he appeared "trashed," smelled of liquor and was slurring his words. (Id.) He told her that he would be back at the day care

10

soon and wanted to get his money. He asked her to be his "eyes and ears" at the center since he wasn't allowed to be there during the week. He further warned her not to repeat anything he said and that to "remember, you didn't see me." (Id.)

After the hearing, my decision was memorialized in an order extending the PFA from that date, March 8, 2018, through March 8, 2020, stating therein that "Plaintiff's request for an amended and extended final protection order is granted." The extended order provides, among other things, that Defendant not abuse, harass, stalk or threaten Plaintiff nor have any contact with her directly or indirectly other than peaceful contact with Plaintiff by text messaging solely concerning custody issues. The order included the prior provisions evicting Defendant from Plaintiff's home and the day care center except he could be on the day care property on Sundays.

## Legal Discussion

In support of his appeal, Defendant has filed a five-page Statement of Errors Complained of on Appeal, in which he sets forth fourteen claims of court error. (Statement ¶¶ 2-15) Inasmuch as the Statement is redundant and not concise, as required by Pa.R.A.P. 1925(b), I necessarily distill the issues into a concise form on Defendant's behalf, as follows: Defendant argues that this court erred and/or abused its discretion by extending the PFA Order (1) where there was a lack of sufficient evidence of harassing or threatening conduct by Defendant against Plaintiff to prove abuse or continuing abuse under the PFAA including a lack of evidence that conduct by Defendant caused or put Plaintiff in reasonable fear of imminent serious bodily injury; (2) where the evidence revealed that Plaintiff's motivation for seeking a PFA extension was not legitimate but "a tactical tool in marital litigation … primarily if not solely intended to resolve business disputes between business partners and their employees"; (3) by precluding Defendant from cross examining Plaintiff on issues related to Defendant's claim that Plaintiff's motive for seeking the PFA extension was not genuine relief under the PFAA but concerned day care center issues; (4) where the order effectively evicted Defendant from the parties' business and prevented him from participating therein, depriving him of property rights, which is not a remedy expressly authorized by the PFAA and (5) where, at the end of the hearing, the court *sua sponte* admitted into the record as exhibits Plaintiff's compilations of written materials.

11

## (1) Sufficiency of Evidence

Defendant first argues that Plaintiff presented insufficient evidence of harassing or threatening conduct by Defendant against her to prove abuse or continuing abuse under the PFAA including a lack of evidence that conduct by Defendant caused or put Plaintiff in reasonable fear of imminent serious bodily injury. Defendant argues that instead, the record revealed only a few incidents of isolated conduct or indirect contact through third persons including alleged contact via Defendant's Facebook page that did not rise to the level of abusive conduct.

PFAA Section 6108 explicitly permits the court to extend a PFA order where it finds that the defendant "committed one or more acts of abuse subsequent to the entry of the final order **or that the defendant engaged in a pattern or practice that indicated continued risk of harm to the plaintiff or minor child.**" 23 Pa.C.S.A. § 6108(e)(1)(i) (bolding and underlining provided).

A petitioner seeking relief under the PFAA must prove his or her right to relief by a preponderance of the evidence. See 23 Pa.C.S.A. § 6107(a). In determining whether evidence is sufficient to prove a right to relief under the PFAA, this court reviews the evidence in the light most favorable to the petitioning party, granting the petitioner the benefit of all reasonable inferences therefrom. Custer v. Cochran, 933 A.2d 1050, 1058 (Pa. Super. 2007) (citation omitted). The trial court is granted broad discretion to make credibility determinations in PFAA proceedings. Id. In determining if a petitioner is entitled to PFAA relief, the petitioner's testimony alone can be sufficient if it believed by this court. Id. Furthermore, "the Protection from Abuse Act requires flexibility in the admission of evidence and that prior instances of abuse are relevant and admissible." Hood–O'Hara v. Wills, 873 A.2d 757, 761 (Pa. Super. 2005).

Defendant failed to testify at the extension hearing and as such, this court may draw a negative inference therefrom. PFAA proceedings, other than those pursuing indirect criminal contempt, are civil in nature. See, Commonwealth v. Nelson, 690 A.2d 728, 731 (Pa. Super. 1997). It is well settled that in a civil proceeding "a party's failure to testify can support an inference that whatever testimony he could have given would have been unfavorable to him." Harmon v. Mifflin Co. School Dist., 713 A.2d 620, 623 (Pa. 1998). The scope of the inference is described in Harmon, as follows:

> Our case law indicates that the inference to be drawn from a party's failure to testify serves to corroborate the evidence produced by the opposing party. Also, the failure to testify to facts within one's presumed knowledge permits an inference that can erase the equivocal nature of other evidence relating to a disputed fact. However, we have

12

never suggested that a party could satisfy its burden of proof in a civil cause solely through reliance on the defendant's failure to testify.

Id. at 623–624 (citations omitted).

The issues Defendant raises is his Statement of Errors challenging the court's grant of the PFA extension all fall within the first clause of Section 6108(e), i.e. that there was insufficient evidence produced to prove he committed one or more acts of abuse. He has not argued lack of evidence under the second clause, "that the defendant engaged in a pattern or practice that indicated continued risk of harm to the plaintiff." Id. Notably, under the second clause, a finding that a defendant committed a new instance of abuse or abuses is not necessary in order for the court to grant an extension.

The record in this case showed that Plaintiff proved by a preponderance of the evidence that she was entitled to extension of the PFA order under the second clause of Section 6108(e)(1)(i). This court found the testimony offered by Plaintiff and her witness ▮▮▮▮▮▮▮ wholly credible. In addition, this court notes that because Defendant failed to testify, his silence acted to corroborate evidence produced by Plaintiff. In essence, none of the factual evidence presented by Plaintiff and ▮▮▮▮▮▮▮ to which Defendant would have knowledge, is disputable.

The record presented via the testimony and exhibits is replete with post-PFA order contacts and conduct made by Defendant in violation of the PFA order's no-contact provision and/or the provision prohibiting him from stalking, abusing, harassing or threatening Plaintiff, all of which reveal a pattern of conduct or practice that indicates a continued risk of harm for Plaintiff. These include: (1) Defendant's two 2016 convictions for indirect criminal contempt due to his violations of the PFA order; (2) Defendant posting a message about Plaintiff on his Facebook page in June 2016 complaining about his relationship and threatening to get their child from Plaintiff where Defendant knew or should have known Plaintiff would see it on the day care center's Facebook timeline since Defendant was friends with the day care center, in violation of the PFA order prohibiting indirect contact; (3) Defendant's text to Plaintiff in November 2016 asking that he be allowed to "come home" to his family, in violation of the PFA order prohibiting direct contact; (4) Defendant taking a job in late 2016 at the liquor store a few doors down from the day care center, which I find was done with the intent of being near Plaintiff and the day care center, and additionally standing at the edge of the liquor store property staring into the day care center, which I further find was an effort to intimidate

13

Plaintiff, in violation of the PFA order prohibiting him from stalking, harassing or threatening Plaintiff; (5) Defendant sending text messages to both Plaintiff and her male friend in June 2017 with an attached picture of Plaintiff in her friend's car, in violation of the PFA order prohibiting indirect contact, direct contact and stalking; (6) Defendant sending a text message to Plaintiff in late November 2017 about the federal lawsuit and ostensibly written by Defendant to his attorney but which this court believes was intentionally sent by Defendant to Plaintiff in an effort to intimidate and alarm her, in violation of the PFA order prohibiting direct contact and prohibiting him from harassing or threatening Plaintiff; (7) Defendant's statement to day care center employee Tiaunna Banks on Sunday February 25, 2018, that he would see her in 20 days, right around the time the PFA order expired, arguably in violation of the PFA order prohibiting indirect contact, but in any event reflecting Defendant's unhealthy preoccupation with being at the day care center; and (8) Defendant's continuing abuse of alcohol and failure to followed the recommended treatment in the Evaluation.

Of the myriad conduct exhibited by Defendant against Plaintiff, Defendant takes particular issue with the Facebook posting. Defendant argues that it was error for me to base my decision granting the extension "upon finding that [Defendant] knowingly had contact with and harassed Plaintiff via comments made on his Facebook page 'where [per the court] he knows it's automatically going to show up on her Facebook' despite the fact that there was absolutely no evidence or testimony of record that [Defendant] knew or had reason to know that the comments which Plaintiff alleged [Defendant] made on his Facebook page would automatically appear in any Facebook page to which Plaintiff had access ..." (Statement of Errors, ¶ 14)

As a matter of background, at the conclusion of the extension hearing, I discussed my concern on the record that even were I to grant the extension, the parties would likely be back in court for indirect criminal contempt proceedings because it is difficult for a PFA defendant (including Defendant) to understand that he is prohibited from "all type[s] of harassment and also contact through other means which includes Facebook and where he knows it's automatically going to show up on her Facebook." (N.T. 3/8/18 at 69-70)

At the outset, I note that I did not base my decision to grant the extension solely upon the Facebook posting. Instead, it was one of many instances of contact Defendant had with Plaintiff revealing "continued risk of harm to the plaintiff." In any event, the record did in fact support my finding that Defendant knew or should have known his Facebook posting would be available for

14

Plaintiff's consumption. The evidence presented, and corroborated by Defendant's failure to testify, was that Defendant's account was linked to the day care center's Facebook account because Defendant had chosen to be friends with it. Defendant additionally knew that Plaintiff operated the day care center's Facebook account and as such, knew or should have known that any postings he made on his own page would appear on the day care center's timeline for Plaintiff to review. See Commonwealth v. Lambert, 147 A.3d 1221 (Pa. Super. 2016) (PFA defendant's posting of remarks about the plaintiff in a publically accessible portion of his Facebook page was in violation of the PFA order prohibiting such posts even where defendant never sent the posts to plaintiff and where plaintiff could only find them by seeking them out).

Furthermore, the record reveals that Defendant is fixated, beyond any normal, rational business reasons, with both Plaintiff's role in running the day care center and with his alleged need to be on the property. Under my order entered in the divorce action excluding him from any participation in the daily operation of the business, from which Defendant *did not* appeal, Defendant has no reason to be on the day care property during business hours. Defendant's interest in the business is being fully protected in the divorce / equitable distribution litigation as well as under my order that permits him access to all financial records related to the day care center. There is simply no reason for Defendant to have expressed to          his great anticipation about the expiring PFA order and his desire to be on the property on the day the PFA order expired. This reveals to the court that his motive to return to the property is not based upon any legitimate business purpose but is instead motivated by a desire to harass and intimidate Plaintiff.

In addition, Defendant initiated three civil suits centering around his claim of an alleged right to operate the day care center and/or his being aggrieved by being excluded from the property or from operating the day care center. These civil actions, while legitimate legal process when viewed in a vacuum, reflect instead Defendant's preoccupation of harassing and intimidating Plaintiff's operation of and employment at the day care center.

Defendant's post-PFA order conduct has revealed he has not respected the terms of the order inasmuch as he has been found in indirect criminal contempt of the order on two occasions and has violated its terms on numerous other occasions (recited above). In addition, the initial PFA was entered upon very serious threats made by Defendant on separate voice mails in which he threatened to both kill and stab Plaintiff ("I'll crush you, and I'll put you in the dirt" and he would "gut" her).

15

Finally, I have significant concern that Defendant's preoccupation with regaining entry to the business, when combined with his serious addiction to alcohol and not following the treatment recommendations, his likely lack of success in his remaining federal civil action, exacerbates the continued risk of harm Defendant poses to Plaintiff. Given the gravity of the original threats giving rise to the original PFA order and Defendant's pattern of conduct since that time, the record was entirely sufficient in proving by a preponderance of the evidence that he poses a continued risk of harm to Plaintiff, warranting extension of the PFA. 23 Pa.C.S.A. § 6108(e)(1)(i).

## (2) Alleged Illegitimate Use of PFAA Proceedings

Defendant next argues that the evidence revealed that Plaintiff's motivation for seeking a PFA extension was not legitimate but that she instead sought an extension as "a tactical tool in marital litigation ... primarily if not solely intended to resolve business disputes between business partners and their employees." Defendant further argues that I acknowledged that the extension order was motivated by this purpose when I stated on the record at the conclusion of the hearing that "I'm hoping that all the custody and divorce and Federal litigation is resolved [within two years]." (N.T. 3/8/18 at 70) Defendant argues this is not an appropriate reason for extension of a PFA order and that by granting the extension, the court is only benefiting third parties (the day care business, employees/staff), which is also not appropriate under the PFAA.

My statement on the record that I hoped the parties could resolve all their litigation within two years was clearly not one reflecting that my decision was made for purposes unrelated to PFA proceedings. Instead, the only issue before me was simply whether Plaintiff proved by a preponderance of the evidence that she was entitled to a PFA extension under PFAA Section 6108(e). I found that Plaintiff met that burden and as such, implicitly found her filings and pursuit of PFA relief wholly legitimate.

### (3) Preclusion of Defendant from Certain Cross Examination

Defendant's third claim is that the court erred by precluding Defendant from cross examining Plaintiff on issues related to Defendant's claim that Plaintiff's motive for seeking the PFA extension was related to issues concerning the day care center and not to seek genuine relief under the PFAA. Defendant suggests, as he did above, that Plaintiff was misusing PFA litigation for this purpose and that her real motivation for seeking the PFA extension was to exclude him from the business.

During cross examination, Defendant's attorney James Ellison asked numerous times about Plaintiff's motive for seeking a PFA extension, clearly exploring whether Plaintiff's goal was to exclude Defendant from the business property for business reasons and not to seek protection from him. (See e.g. N.T. 3/8/18 at 48-49, 50) At one point, Defendant's attorney asked Plaintiff whether she had paid him any of his business profits and I ruled the question irrelevant. (N.T. 3/8/18 at 51) Defendant's attorney responded that he intended to ask the question because it was relevant to her motive for asking for the PFA extension and he interpreted my ruling as a prohibition on him asking about her motive. I specifically ruled shortly after this exchange that counsel *was permitted* to ask her about her motivation was for seeking a PFA extension. (N.T. 3/8/18 at 52) Plaintiff indeed answered the questions he posed, stating that her motive in seeking an extension was not to exclude Defendant from the day care center for business purposes but that she also did not want him to come back to the day care center. (N.T. 3/8/18 at 49, 63) It is unclear why Defendant is raising this objection inasmuch as he was permitted to ask the question he desired. In any event, I found credible Plaintiff's evidence that she sought PFA relief because she is genuinely fearful of Defendant and that he poses a continued risk of harm to her, as discussed above.

### (4) Eviction of Defendant from the Day Care Property

Defendant next argues that the PFA extension order effectively evicted him from the parties' business and prevented him from participating therein, depriving him of property rights, which is not a remedy expressly authorized by the PFAA.

This claim lacks merit. The PFAA explicitly provides that where a protective order is warranted, the court is authorized to issue an order "restraining the defendant from entering the place of employment or business ... of the plaintiff ..." 23 Pa.C.S.A. § 6108(a)(6). That Defendant has a property interest at the location where Plaintiff is employed and will be evicted from the business is an issue collateral to the court's right to grant relief explicitly authorized under the PFAA. Defendant otherwise cites no legal authority for his claim that the court cannot impose relief under subsection (a)(6) in such circumstances. Instead, the PFAA acknowledges that in the case where a PFA defendant's residence is involved, the PFA defendant's possessory rights can be divested where a protection order is warranted. See 23 Pa.C.S.A. § 6108(a)(2) (relief may include eviction of defendant from a jointly owned or jointly leased residence).

17

I also note that Defendant agreed to this provision by consenting to the entry of the initial PFA order. As discussed above, Defendant's presence at the day care center has created innumerable, serious problems for Plaintiff, the employees and children, and of the ability of the day care center to remain operating.

### (5) Admission into Evidence of Plaintiff's Exhibit

Defendant claims I improperly admitted into the record the written materials Plaintiff presented at the hearing discussed during her testimony. (Exbt. Plt-1). Two times during the hearing I addressed the admission of her exhibit. First, after Plaintiff testified about events included in her two-page outline and after Defendant's attorney introduced his own exhibit, I stated that Plaintiff's exhibit was admitted. (N.T. 3/8/18 at 13) Defendant offered no objection at the time. Second, at the very conclusion of the hearing, after addressing Defendant's question regarding transcript availability, I stated: "I admit her entire exhibit, even people that didn't testify. I'm not admitting them for the truth of the matter asserted therein but for the effect of their statements on [Plaintiff]." (N.T. 3/8/18 at 70) Defendant's attorney again raised no objection to my admission of the Plaintiff's exhibit.

Defendant argues that this was error since I had previously sustained Defendant's hearsay objections to Plaintiff's testimony about the written statements by declarants who were not present to testify. Defendant's recollection on this point is not correct. During his cross examination of Plaintiff, Defendant's attorney asked Plaintiff about the six witness statements/affidavits she included in her exhibit packet and whether any of those individuals would be testifying.[9] Plaintiff responded that only one of them would testify ▓▓▓▓▓▓▓▓ (N.T. 3/8/18 at 57) Defendant's attorney then stated: "Judge, to the extent that these people who executed these affidavits are not in court to testify, I need to have these affidavits stricken. Number 1, they're hearsay and certainly ▓▓▓▓▓▓ should have the right to cross-examine them on the contents of these affidavits." (N.T. 3/8/18 at 57) I made no ruling in response to counsel's request and thus did not strike from Plaintiff's exhibit the five affidavits of the non-testifying witnesses. In any event, I did later note that I would not be considering them for the truth of the matter set forth in the affidavits but only for their effect on Plaintiff. (N.T. 3/8/18 at 70)

---

[9] Those statements had been made in approximately August 2016 by four different day care center employees, an individual whose children worked there, and by a friend of both Plaintiff and Defendant. (Exbt. Plt-1)

Assuming Defendant preserved the objection, my ruling permitting limited admission of the affidavits, to the extent if may have been in error, was harmless. The substance of the five affidavits submitted for the non-testifying witnesses all included cumulative information already credibly offered into evidence by both Plaintiff and ▮▮▮▮▮▮▮ This information included that the affiants saw Defendant at the day care center intoxicated on many occasions, that he went to the liquor store over lunch almost every day, that he smelled of alcohol when he returned, that he acted mean and inappropriately towards staff when intoxicated, that he treated Plaintiff badly when intoxicated and that the DPW investigated the day care center as a result of his actions. (Exbt. Plt-1)

Accordingly, I entered the Order of May 8, 2018, extending the previous PFA order until May 8, 2020.

June 7, 2018
Date

Jeannine Turgeon, Judge

Distribution:

James Ellison, Esq. – P.O.B. 1023, Harrisburg Pa.   17108-1023

▮▮▮▮▮▮▮

JUN 07 2018

I hereby certify that the foregoing is a true and correct copy of the original filed.

Matthew R. Krupp
Prothonotary

19