J-A28034-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| KAYLA CREE QUINN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRIAN JOSEPH QUINN | : | |
| | : | |
| Appellant | : | No. 1551 EDA 2024 |

Appeal from the Order Entered May 15, 2024
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2024-08412

BEFORE: PANELLA, P.J.E., STABILE, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:           **FILED MARCH 12, 2025**

Brian Joseph Quinn (Husband) appeals from a final order issued pursuant to the Protection From Abuse (PFA) Act[1] granting a PFA petition filed against him by his wife, Kayla Cree Quinn (Wife), for a period of three years. The final PFA order prohibited Husband from contacting Wife, awarded Wife exclusive possession of the marital residence, and granted Wife temporary custody of the parties' three minor children.[2] We affirm.

---

[1] 23 Pa.C.S. §§ 6101-6122.

[2] The trial court issued a final PFA order on May 2, 2024, but deferred consideration of the custody matters raised in Wife's PFA petition to a hearing scheduled for May 15, 2024, to give the attorney appointed guardian *ad litem* for the children the opportunity to gather information about them. **See** PFA Order, 5/2/24, at 3; N.T., 5/2/24, at 3-10. After a hearing on May 15, 2024, the custody provisions in the final PFA order of May 2, 2024, were amended by agreement of the parties by an order issued on this same date. **See** Am.
*(Footnote Continued Next Page)*

By way of background, Wife filed a *pro se* PFA petition alleging that after Husband began "yelling" in her face on the evening of Sunday, April 21, 2024, she shoved him in response. *See* PFA Pet., 4/24/24, at 5. Thereafter, she stated that Husband began "throwing [her] to the ground and holding [her] down on the floor." *Id.* Wife alleged that she sustained "bruises all over [her] body," and that she was still sore days after the incident. *Id.* Wife noted that Husband is more than one hundred pounds heavier than her. *See id.*

In her PFA petition, Wife referenced Husband's other acts of abuse against her, including that she had filed a prior PFA petition in 2020 because Husband had physically assaulted her, and that Husband had been arrested in relation to this prior PFA petition.[3] *See id.* at 6. Wife indicated that during the course of the parties' five years of marriage Husband perpetrated the following abuse against her: "[g]rabbing, shoving, or pushing"; "[s]lapping (with an open hand)"; and "[p]hysically restraining/holding [her] down[.]"[4] *Id.* at 7. Wife alleged that this conduct occurred "every few months[,]" and that Husband's abusive conduct had increased over the past year. *Id.* at 6-7.

_____

PFA Order, 5/15/24. We have amended the instant caption to reflect that this appeal properly lies from the amended final PFA order of May 15, 2024.

[3] Wife ultimately withdrew her 2020 PFA petition and requested that the Commonwealth drop all charges. *See* N.T., 5/2/24, at 18-19, 33.

[4] In addition, Wife alleged that Husband would make phone calls and send text messages that were "threatening or harassing" and would call her names and use obscenities towards her. *See* PFA Pet., 4/24/24, at 7.

The trial court held an evidentiary hearing on Wife's petition on May 2, 2024. Wife was represented by counsel, while Husband appeared *pro se*. The parties testified on their own behalf and called no other witnesses.

During the hearing, on direct examination Wife described the April 21, 2024 incident, which occurred in the parties' marital home, as follows:

Q: Can you explain to the court what happened on that Sunday, April 21st, 2024?

A: . . . Instantly he's in my face saying words like ["]you're just like your F'in mom, you're twisting words, you're a liar.["] God, so close to my face (indicating). And I shoved him away, because he was that close to my face with his finger. And then after that I was thrown to the ground. I still have bruising all over my body. And then he says I attacked him.

Q: Did you attack him at all?

A: No.

* * *

Q: What were you feeling when he was in your face at that point?

A: I already knew what was going to happen. I was going to shove him out of my face just to get him away after I said please leave, because he never leaves. I shoved him out of my face and right away he says I am attacking him[,] and he puts his hands on me.

Q: When you said you [knew] what was going to happen, what did you know he was going to do?

A: He was going to start saying you're attacking me, you're attacking me and pushing me and pushing me[,] and I ended up on the floor.

Q: Okay. You said that he picked you up then?

A: He slammed me down to the ground and then held me down.

Q: How did he hold you down?

A: With his knee on my wrist and then held me down with the other side. And I was down on all fours. I am all of 97 pounds[;] I don't need to be restrained[;] I can be flipped across the room.

[THE COURT]: Do you know what your husband weighs?

A: At least 215 or 220.

[Wife's counsel]: So once he had you pinned down on the ground, what happened next?

A: I kept trying to push him off me. I was trying to kick him off, kick him off. And he got up and I looked at him and said I hate you.

Q: And you testified that there are, that there were bruises left after this incident?

A: Yes.

Q: And where are the bruises on your body . . . ?

*   *   *

A: Left knee. Right knee. And I have, had bruising all up my upper arms, my lower arms, on my side and on my chest.

*   *   *

Q: So what happened after [Husband] got off of you?

A: He got up and I said, I kept asking him to leave. . . . It turned [] verbal at that point. . . . Then he slept in the garage.

N.T., 5/2/24, at 12-16. Wife clarified later in her testimony that she requested that Husband leave their marital home immediately after the incident and locked herself in her home office that night. *See id.* at 16.

Wife also testified that she has endured other episodes of physical abuse by Husband over the course of their marriage, specifically that Husband would push, shove, hit, and throw her to the ground during incidents that occurred approximately "every five or six months." *Id.* at 17-18. Wife stated that she

sustained a hairline fracture to her wrist as a result of the 2020 incident described in a prior PFA petition. *See id.* at 18-19.

Husband testified that Wife was the aggressor in the April 21, 2024 incident, and that he only acted in self-defense. *See id.* at 25. Husband described the same incident as follows:

> In reference to [that] Sunday night, . . . [Wife] did assault me. She didn't push me away. She began hitting me in the face, numerous times. I was able to try and hold her hands to stop her. She began kneeing me. She began trying to kick me, very violent. Granted, she is a very light person, she is not really able to harm me, but I really don't have much of a defense to protect myself.
>
> To her point, I did sleep in the garage. I was able to get away from her when she was calm a little bit.

*Id.* at 23, 25. Husband testified that Wife exhibited "drunken behavior" on the night of the incident. *Id.* at 26.

On cross-examination, Husband provided the following additional description:

> Q: So [Wife was] trying to get away from you?
>
> A: No, no, she was attacking me. This was not her trying to get away from me. She was kneeing me. I think she would knee the cabinet trying to knee me and kick me.
>
> Q: Okay. So your testimony is that as you were holding her down she was trying to attack you?
>
> A: . . . [A]s things escalated she was punching me, she was kneeing me, kicking me. We were on the ground but I wasn't really holding her, I was holding her hands primarily to keep her from hitting me.
>
>          *     *     *
>
> Q: But you were pinning her down by her hands?

- 5 -

A: I wouldn't say pinning her down. I was holding her hands for sure. We were on the ground but I wasn't like covering her, I wasn't on top of her.

Q: How were you holding her hands then?

A: I grabbed her hands as she was hitting me and she was kneeing me and I came down to the ground with her. It happened really quickly and I couldn't describe in exact detail. All I know is I was trying to get away safely[,] and I did flee to the garage as soon as I could.

Q: So you did take her to the ground then; correct?

A: Or she took me to the ground.

Q: Well, you testified that you took her to the ground when you were holding her hands?

A: Yeah, I ended up on the ground I said. It was a joint engagement escalated by her.

*Id.* at 32-33.

Husband denied that he ever perpetrated violence against Wife during the course of their marriage, testifying that, "I don't abuse my wife[,]" and stating that he was forced to act in self-defense on past occasions due to the following pattern of behavior by Wife:

[A]s far as [Wife]'s own drunken, violent behavior, which happens like every few months like she said, this is an issue we have been dealing with. Like [Wife] does suffer from very heavy mental illness.

\* \* \*

[Wife], she does get aggressive when she is drunk. She has hit me numerous times.

\* \* \*

Numerous times when [Wife] comes after me[,] I have to break out my camera and start recording her as it is my only defense . . .

- 6 -

*Id.* at 23, 25. With respect to Wife's hairline wrist fracture sustained in 2020, Husband testified that "it actually occurred from [Wife] hitting me repeatedly that night[.]" *Id.* at 22.

Husband also testified that Wife suffers from an unspecified mental illness and is prescribed "anti-psychotics" and "antidepressants" and attempted to introduce photographs of prescription bottles related to this testimony into evidence; the trial court excluded these photographs. *Id.* at 23-24. Husband expressed that he does not "feel safe in [his] home[.]" *Id.* at 29. He stated that he has slept in his car or locked himself in the playroom in their home when Wife exhibited such behaviors in the past. *Id.* at 31. When Wife's counsel asked Husband on cross, "[t]hose other times you also did not call the police on [Wife]; correct?" Husband answered, "[n]o." *Id.* To illustrate Wife's alleged aggression, Husband played a video at the PFA hearing. *See id.* at 27. After viewing this video, Wife did not object to the admission of Husband's video into evidence.[5] *See id.* at 26-29. However, Husband did not have a copy of the video to submit to the trial court at the time of the hearing; therefore, the court excluded the video for this reason. *See id.* at 27-29.

At the conclusion of the PFA hearing on May 2, 2024, the trial court entered a three-year PFA order against Husband that evicted him from the

---

[5] Specifically, after Husband played the video, Wife's counsel stated that "I have no issues with this coming into evidence at all[,]" and Wife stated that "I am very glad that we have that." *See* N.T., 5/2/24, at 27.

marital home and continued the temporary custody provisions from a preliminary PFA order with regard to the parties' children. On May 15, 2024, the trial court amended the May 2, 2024 PFA order to include more specific custody provisions based on an agreement between the parties. On May 31, 2024, Husband, through counsel, timely filed a notice of appeal, and both Husband and the trial court timely complied with Pa.R.A.P. 1925.[6]

On appeal, Husband raises the following issues for our review:

1. Whether the trial court committed an error of law or abused its discretion in granting Wife's Petition for [PFA] and entering a [PFA] Order for three years?

2. Whether the trial court erred or abused its discretion in excluding evidence of Wife's prescriptions offered by Husband to establish Wife's credibility?

3. Whether the trial court erred or abused its discretion in excluding evidence of a video offered by Husband because Husband did not have a copy of the video to offer into evidence?

Husband's Brief at 6.

In his first issue, Husband argues that Wife failed to meet her evidentiary burden pursuant to the PFA Act at Section 6102(a)(2). *See id.* at 17-18. Specifically, Husband asserts that Wife was the aggressor in the April 21, 2024 incident, which drove him to sleep in the garage to allow her "to cool off." *Id.* at 16. Husband contends that Wife was not in fear of imminent

_____

[6] On July 2, 2024, this Court filed an order designating this matter as a Children's Fast Track appeal because of the child custody provision previously noted. *See* Order, 7/2/24.

- 8 -

serious bodily injury from Husband because she did not call the police and also stayed in the home following the incident. *Id.* at 16-17. Further, Husband notes that Wife had no visible injuries on her arms from the incident, and that she failed to introduce photographic evidence of any injuries. *Id.* at 14.

Our standard of review in this context is well-established:

In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion.

The PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence. A preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, enough to tip a scale slightly.

When a claim is presented on appeal that the evidence was not sufficient to support an order of protection of abuse, we review the evidence in the light most favorable to the petitioner and[,] granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

\* \* \*

A PFA petitioner's testimony alone, if believed by the trial court, may constitute sufficient evidence of abuse.

*E.K. v. J.R.A.*, 237 A.3d 509, 519, 523 (Pa. Super. 2020) (citations omitted and some formatting altered). We recognize that the weight "to be accorded to [a witness's] testimony is within the exclusive province of the trial court as the fact finder." *S.G. v. R.G.*, 233 A.3d 903, 907 (Pa. Super. 2020) (citations omitted). Further, a "petitioner's testimony alone, if believed by the trial

court, may constitute sufficient evidence of abuse." *E.K.*, 237 A.3d at 523 (citation omitted).

The PFA Act defines "abuse," in relevant part, as "acts between family or household members[,]" including "[p]lacing another in reasonable fear of imminent serious bodily injury." 23 Pa.C.S. § 6102(a)(2); *see also* 23 Pa.C.S. § 6102(b) (providing "[t]erms not otherwise defined in this chapter shall have the meaning given to them in 18 Pa.C.S. (relating to crimes and offenses)[]"). "Serious bodily injury" is defined in the Crimes Code as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301.

This Court has recognized that the "primary goal" of the PFA Act is to prevent "physical and sexual abuse" and that a trial court's objective in PFA proceedings "is to determine whether the victim is in reasonable fear of imminent serious bodily injury." *E.K.*, 237 A.3d at 519 (citations and quotation marks omitted). Moreover, "[a] PFA petitioner is not required to file a police report" to meet their evidentiary burden. *Custer v. Cochran*, 933 A.2d 1050, 1058 (Pa. Super. 2007) (citation omitted). In addition, "[p]ast acts are significant in determining the reasonableness of a PFA petitioner's fear." *E.K.*, 237 A.3d at 519 (citation omitted).

Here, the trial court credited Wife's testimony regarding the April 21, 2024 incident. *See* Trial Ct. Op., 7/22/24, at 6. During the hearing the trial court observed that Wife still had a "pretty large bruise on the left leg from

the knee down through the calf" and bruises on the inside of her left leg. N.T., 5/2/24, at 15-16. Wife testified that, due to the April 21, 2024 incident and prior incidents that occurred during the parties' marriage, she lives in fear that Husband will cause her imminent serious bodily injury. *See id.* at 20. The trial court concluded that Wife met her evidentiary burden. *See* Trial Ct. Op., 7/22/24, at 6-8.

The trial court's conclusion, that Wife demonstrated by a preponderance of the evidence that she was in "reasonable fear of imminent serious bodily injury" from Husband, based on the April 21, 2024 incident and prior similar occurrences over the course of the parties' marriage, is supported by the record. *See E.K.*, 237 A.3d at 519, 523; 23 Pa.C.S. § 6102(a)(2); 18 Pa.C.S. § 2301. Further, contrary to Husband's assertion, Wife was not required to call the police following the incident to meet her evidentiary burden. *See Custer*, 933 A.2d at 1058. We note that Husband also did not call the police during or after prior incidents where Husband claimed that Wife was the aggressor and he the victim. *See* N.T., 5/2/24, at 31. Viewing the evidence in the light most favorable to Wife as petitioner, and also noting that the trial court explicitly credited Wife's testimony, we find no error or abuse of discretion in the trial court's conclusion that Wife had been abused by Husband pursuant to the PFA Act at Section 6102(a)(2). Therefore, Husband's first claim fails. *See E.K.*, 237 A.3d at 519.

Husband's second and third issues relate to the trial court's evidentiary rulings, and we address them together. First, Husband argues that the trial

court erred or abused its discretion when it excluded photographs of Wife's prescription bottles, which he introduced at the hearing "to explain [Wife]'s behavior on the night of the alleged incident," *i.e.*, that she was the aggressor, and he was defending himself from her. Husband's Brief at 19-20. Husband also argues that the trial court erred or abused its discretion in excluding a video of Wife from the night of the incident. *See* Husband's Brief at 21-22.

In PFA matters, "[q]uestions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and may be reversed on appeal only when a clear abuse of discretion was present." ***Diaz v. Nabiyev***, 235 A.3d 1270, 1273 (Pa. Super. 2020) (citation omitted). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or unduly prejudicial to the complaining party." ***K.B. v. Tinsley***, 208 A.3d 123, 130 (Pa. Super. 2019) (citation omitted and some formatting altered).

It is within a trial court's discretion to "hear any relevant evidence to assist it in its obligation to assess the [petitioner]'s entitlement to and need for a [PFA] order." ***Diaz***, 235 A.3d at 1273 (citation omitted). Relevant evidence is evidence that "has any tendency to make a fact more or less probable than it would be without the evidence; and [] the fact is of consequence in determining the action." Pa.R.E. 401 (formatting altered). "Evidence that is not relevant is not admissible." Pa.R.E. 402.

Here, Husband testified that he had "a picture of [Wife's] prescription bottles that were around the house." N.T., 5/2/24, at 23. Thereafter, the following exchange occurred:

[THE COURT]: Counsel, have you seen them?

A: They can have the photos. . . .

[Wife's Counsel]: I would certainly object to this coming in as any sort of evidence. First off as far as relevance. Second, there [are] no dates on any of these prescription bottles.

A: Oh, my God, I have a picture of the back that would provide the date.

[THE COURT]: I will sustain your objection.

*Id.* at 24.

The trial court sustained Wife's objection to the photographs on the basis that they were "irrelevant to this matter and do not include dates on the prescription bottles[]" and that Husband offered no "medical expert or the prescribing doctor" regarding them. Trial Ct. Op., 7/22/24, at 8-9 (citing N.T., 5/2/24, at 24). Based on our review of the record, we discern no error or abuse of discretion by the trial court in excluding Husband's photographs of the prescription bottles. *See Diaz*, 235 A.3d at 1273. Beyond asserting that Wife had been prescribed medication for an unknown mental illness, Husband did not offer any further explanation regarding the nature of Wife's purported illness. *See* N.T., 5/2/24, at 23-24. Further, as a lay witness Husband was not qualified to opine on any "scientific, technical, or other specialized knowledge[,]" including any medical conditions Wife might have or the effects

- 13 -

of these medications on Wife's behavior. *See* Pa.R.E. 701, 702 (rules of evidence addressing the parameters of lay and expert testimony). We also note that by explicitly crediting Wife's testimony as to the April 21, 2024 incident, the trial court rejected Husband's counter-narrative that Wife was the aggressor. *See* Trial Ct. Op., 7/22/24, at 6-8; *S.G.*, 233 A.3d at 907. Accordingly, whether Wife was prescribed medication for an undisclosed medical condition was of no consequence to whether Husband had physically abused Wife on the date of the incident. *See* Pa.R.E. 401, 402. Therefore, Husband is not entitled to relief on his second issue.

With regard to the trial court's exclusion of Husband's proffered video, the trial court had permitted Husband to play this video at the PFA hearing. *See* N.T., 5/2/24, at 27. However, Husband did not have a copy of the video to provide to the court for its admission, and the court excluded it for this reason. *See id.* at 27-29. On cross examination, Husband testified with respect to the video:

> Q: In that video you showed us, [Wife] actually wasn't near you at all in that video, was she?
>
> A: No, she stopped when I pulled my phone out. That has happened before.
>
> Q: So it doesn't show her being actually aggressive to you; correct?
>
> A: No.
>
> Q: And it is a video that was taken after the incident that occurred; correct?
>
> A: Yes.

Q: So there is no video proving that [Wife] is the one that attacked you; correct?

A: No video either way, no.

*Id.* at 31-32.

Here, the trial court explained:

. . . [T]he video and accompanying audio were not admitted into evidence because Husband did not provide the court and Wife's counsel with a copy of the cell phone video. Practically, the court is unable to enter any individual's cell phone into evidence and the court is without the technological duty to make a copy of a cell phone video for either party. If Husband had offered a copy of the video to the court, then the court could have marked it into evidence. Therefore, it is incumbent upon any party before the court to come to court prepared with proper copies of any evidence they plan to submit at the hearing.

Husband cannot hide behind his *pro se* status. Husband represented himself at the May 2, 2024 hearing, and the courts of this Commonwealth have long held that *pro se* litigants are held to the same procedural rules and laws as attorneys admitted to the bar of the Commonwealth of Pennsylvania. *See Kozicki v. Unemployment Compensation B.D.*, 299 A.3d 1055, 1063 (Pa. Cmwlth. 2023) (citation omitted).

Furthermore, and perhaps most importantly, on cross-examination by counsel for Wife, Husband admitted that the cell phone video and accompanying audio . . . does not show Wife being aggressive toward Husband. Husband admitted that the video was taken after the April 21, 2024 incident occurred, and Husband admitted that no video exists proving that Wife attacked Husband. *See* N.T., 5/2/24, at 31-32.

Trial Ct. Op., 7/22/24, at 9-10.

On this record, we conclude that the trial court did not err or abuse its discretion in excluding Husband's video from evidence. *See Diaz*, 235 A.3d at 1273, Pa.R.E. 401, 402. Although Husband represented himself *pro se*, a

- 15 -

*pro se* litigant must still make the necessary preparations for such representation prior to the commencement of the proceeding. **See Smithson v. Columbia Gas of PA/NiSource and Maple Grove Enters.**, 264 A.3d 755, 760 (Pa. Super. 2021) (explaining that "[a]ny layperson choosing to represent himself [or herself] in a legal proceeding must, to some reasonable extent, assume the risk that his [or her] lack of expertise and legal training will prove his [or her] undoing[]") (citations omitted). Therefore, Husband is also not entitled to relief on this issue.[7] Finding no merit in Husband's issues, we affirm the PFA order.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/12/2025

---

[7] Even if the trial court erred by excluding the video, we would conclude that it was harmless error as Husband acknowledged that the video does not depict any aggression by Wife on the evening of April 21, 2024. **See J.M.G.**, 229 A.3d at 580; **see** N.T., 5/2/24, at 31-32. As such, the video would not have changed the trial court's conclusion that Wife had been abused by Husband on that date. **See id.**